### BUCKINGHAM v. DAKE et al.

(Circuit Court of Appeals, Eighth Circuit. November 25, 1901.)

#### No. 1,557.

2. JURISDICTION OF FEDERAL COURTS—SUIT BY ASSIGNEE—REPLEVIN FOR MORTGAGED PROPERTY.

An action of replevin by the assignee of a promissory note, secured by a chattel mortgage, to recover possession of the mortgaged property from a stranger to the contract, for the purpose of ultimately subjecting it to the mortgage, is not a suit to recover the contents of a chose in action, within the meaning of Act March 3, 1887 (24 Stat. 552), so as to make the jurisdiction of a federal court dependent on whether it would have had jurisdiction if no assignment or transfer had been made.

3. CHATTEL MORTGAGE—CONSTRUCTION—EXTENT OF LIEN.

A chattel mortgage on cattle, given to a live stock commission firm, provided that the cattle should be kept on the premises described until full payment of the debt secured, unless sooner marketed or removed with the written consent of the mortgagees or their assigns, and that when marketed said cattle were to be shipped and consigned to the mortgagees for sale, and when sold the proceeds should be first applied in payment of the customary commissions to the mortgagees for selling the same, and that if shipped elsewhere the mortgagees should be entitled to the same commissions. A subsequent clause provided for the sale of the cattle at public auction to the highest bidder in case of default in payment of the mortgage debt, the surplus proceeds after paying such debt to be paid to the mortgagor. *Held*, that such provisions gave the mortgagees a right to commissions only on the contingency that the cattle were shipped to market and sold by their consent, and that after the maturity of the note secured, and its transfer to a third party, the mortgagees were not necessary parties to an action of replevin brought by the assignee to recover the cattle for the purpose of foreclosing the mortgage.

3. PARTIES—DEFECT OF PLAINTIFFS—WAIVER OF OBJECTION.

Under Gen. St. Kan. 1889, §§ 4172, 4174, which provide that a misjoinder or defect of parties plaintiff is waived if not taken advantage of by demurrer or answer, a defendant cannot object to an alleged defect of parties plaintiff for the first time on the trial, where the answer consisted only of a general denial.

4. REPLEVIN—TITLE TO SUSTAIN ACTION—ASSIGNEE OF NOTE SECURED BY CHATTEL MORTGAGE.

Under Gen. St. Kan. 1889, § 3909, which provides that in the absence of stipulations to the contrary the mortgagee of personal property shall have the legal title thereto and the right of possession, and the state decisions to the effect that a transfer of the note secured carries with it, as an incident, title to the mortgaged property, a transferee of a note secured by a chattel mortgage takes title to the property, and may maintain replevin therefor against a third person in possession, although the transfer was not made until after the maturity of the note, and after a demand for the property had been made by the mortgagee.

5. SALE—PASSING OF TITLE—PLACE OF DELIVERY.

Where by the terms of a contract for the sale of personal property the seller is to deliver the same at a certain place, paying the freight thereon, such place becomes the place of sale, and the title does not pass until delivery has been there made.

6. CHATTEL MORTGAGE—PURCHASER OF MORTGAGED PROPERTY—ACCEPTANCE AFTER NOTICE OF MORTGAGE.

Defendant contracted for the purchase of 500 head of cattle, which he had previously inspected in the yards of the seller, which were 50 miles from his own place. The seller was to ship the cattle to defendant's place and pay the freight thereon. Three days later the seller purchased 300 head of cattle, which he caused to be shipped to his place, and from there to defendant's. Prior to such reshipment the seller executed a mortgage on such cattle, of which defendant had knowledge before they arrived. He accepted the cattle, and subsequently made a payment thereon. *Held*, that the title to the cattle did not pass, under the contract, until they arrived at defendant's place, and were accepted by him as substitutes for those bought, and that, the mortgage thereon having been previously given to his knowledge, he took subject thereto.

In Error to the Circuit Court of the United States for the District of Kansas.

This was an action in replevin instituted by A. C. Dake and E. A. Keeler, the defendants in error, against E. J. Buckingham, plaintiff in error, to recover possession of 311 head of three year old steers. The plaintiff below claimed title to the steers by reason of a chattel mortgage executed by one Gillett on November 18, 1898, to secure the payment of a certain negotiable promissory note executed by Gillett, of even date with the mortgage, for the sum of $15,060.93, payable December 3, 1898, to the order of Thomas Trower's Sons, indorsed by the last-named firm, and held by the plaintiffs at the time of the institution of this suit. In due course, pursuant to the provisions of the statutes of Kansas, an order of delivery was secured, the defendant, Buckingham, executed a redelivery bond to the plaintiffs, and the cattle were left in the possession of the defendant. The defendant then filed his answer to the petition, denying each and every allegation thereof. The case came on for a hearing, which resulted in a judgment in favor of the plaintiffs for the possession of the cattle, and, in default of delivery thereof to them, a money judgment for $13,800.11. To reverse this judgment, the case is brought here by writ of error.

Clifford Histed and Garland M. Jones (Charles Blood Smith and W. H. Rossington, on the brief), for plaintiff in error.

C. Angevine (J. K. Cubbison, on the brief), for defendants in error.

Before SANBORN and THAYER, Circuit Judges, and ADAMS, District Judge.

ADAMS, District Judge, after stating the case as above, delivered the opinion of the court.

The first assignment of error raises the question of jurisdiction. The record discloses that Buckingham was a citizen of Kansas; that two members of the firm of Trower's Sons, the payees in the note secured by the mortgage, were also citizens of Kansas, and that the plaintiffs, Dake and Keeler, were citizens. of Colorado; that Trower's Sons held the note and mortgage in. question until December 10, 1898, when the note, duly indorsed by them, with the mortgage securing the payment of the same, was transferred to the plaintiffs; that, prior to the delivery of the note and mortgage to plaintiffs, Trower's Sons made a demand upon Buckingham for the possession of the cattle in question; that afterwards, on December 31, 1898, and prior to the commencement of this suit, the plaintiffs made a later demand for the cattle. It is contended by defendant that this was a suit to recover the contents of a chose in action, within the meaning of the act of March 3, 1887 (24 Stat. 552). The provision of that act relied upon reads as follows:

"Nor shall any circuit or district court have cognizance of any suit except upon foreign bills of exchange, to recover the contents of any promissory note, or other chose in action, in favor of any assignee, or of any subsequent holder of such instrument  *  *  *  unless such suit might have been prosecuted in such court to recover the said contents, if no assignment or transfer had been made."

As already observed, this was a suit in replevin. It is true, plaintiffs set up the mortgage and note, and alleged the transfer of them to themselves, in their petition, but these averments were made solely for the purpose of showing their title and right to the possession of the property mortgaged. The object of the suit was not to foreclose the mortgage, nor to secure a judgment upon the note, but to secure possession of the cattle mortgaged, for the ultimate purpose of subjecting them by proper proceedings to the obligation created by the mortgage. Gillett, the maker of the note and mortgage, would have been a necessary party to a suit to recover their contents; but he was not a party, and was not required to be a party, to this action. The only defendant to this action is one Buckingham, a stranger to the contract evidenced by the note and mortgage, and, according to the averments of the petition, a trespasser wrongfully in possession of the cattle in question. The gist of the action in replevin is the wrongful detention of property. The action itself sounds in tort. Wilson v. Fuller, 9 Kan. 176–190; Wilhite v. Williams, 41 Kan. 288–290, 21 Pac. 256, 13 Am. St. Rep. 281.

The supreme court of the United States, in Deshler v. Dodge, 16 How. 622, 14 L. Ed. 1084, placed a construction upon the eleventh section of the judiciary act of 1789, which denied to any circuit or district courts cognizance of any suit "to recover the contents of any promissory note or other chose in action in favor of an assignee unless a suit might have been prosecuted in said court to recover

the said contents, if no assignment had been made." This, it will be observed, is substantially the same as the provision found in the judiciary act of 1887 under consideration. In that case the supreme court, speaking by Mr. Justice Nelson, says:

"We are of opinion that this clause of the statute has no application to the case of a suit by the assignee of a chose in action to recover possession of the thing in specie, or damages for its wrongful caption or detention, and that it applies to cases only in which the suit is brought to recover the contents or to enforce the contract contained in the instrument assigned."

In a subsequent case (Bushnell v. Kennedy, 9 Wall. 387–392, 19 L. Ed. 736, 738), it was held that the exceptions to the jurisdiction applied only to "rights of action founded on contracts which contain within themselves some promise or duty to be performed," and "not to mere naked rights of action founded on some wrongful act, some neglect of duty to which the law attaches damages."

In the case of Ambler v. Eppinger, 137 U. S. 480–482, 11 Sup. Ct. 173, 34 L. Ed. 765, the supreme court, considering the language found in the judiciary act of 1887, already quoted, approves the construction placed upon the same provision of the judiciary act of 1789, and says, referring to the exceptions to jurisdiction, as follows:

"They must be such as arise upon contracts of the original parties, and not founded, like the one in controversy, upon a trespass to property."

We think the foregoing cases are decisive of the question now under consideration. Many of the cases to which our attention is called by learned counsel for defendant relate to a consideration of the judiciary act of March 3, 1875. This last-mentioned act differs materially from the acts of 1789 and 1887. The act of 1875 (18 Stat. 470) provides that neither the circuit nor district court shall have cognizance of any suit "founded on contract in favor of an assignee unless a suit might have been prosecuted in such court to recover thereon, if no assignment had been made," while the other acts withhold jurisdiction only in cases where the action is to recover the contents of promissory notes or other choses in action. This difference makes many of the cases and much of the argument relied upon by learned counsel inapplicable to the present case.

We are clearly of opinion that this first assignment of error is without merit.

The proposition relied upon by defendant's counsel in support of their next assignment of error is that there was a defect of parties plaintiff in this case, because the members of the firm of Trower's Sons were necessary parties, and were not joined with the plaintiffs. They contend that the following provisions of the chattel mortgage in question conferred upon Trower's Sons a valuable interest in the mortgaged property, requiring them to be made parties to the action, namely:

"When marketed, said cattle are to be shipped and consigned for sale to Thomas Trower's Sons, at the stock yards at Kansas City or St. Joseph, Mo.; and when sold, the proceeds thereof shall be applied, first, in payment of the usual and customary commission to said Thos. Trower's Sons for selling same; and the balance, or so much thereof as may be necessary,

shall be applied on the indebtedness hereinafter described. If said cattle, or any part thereof, be consigned or sold elsewhere than above, then said mortgagee shall be paid a commission of 50 cents per head for each head so consigned or sold: provided, always, and these presents are upon this express condition, that if said party of the first part shall pay or cause to be paid unto the said party of the second part, its successors or assigns, the commissions heretofore stated and agreed upon, and the aforesaid sum of $15,060.93, according to the terms of one certain promissory note of even date herewith, executed," etc., "* * * then these presents and everything herein contained shall be void, anything herein contained to the contrary notwithstanding."

It is contended that, by virtue of the foregoing provisions of the mortgage, the holder of the note, whoever he might be, and Trower's Sons, by reason of the right reserved to them in the mortgage of a commission of 50 cents per head on the cattle, became tenants in common of the mortgaged property, to the extent of their respective interests. In arriving at the true construction to be placed upon the mortgage in question, it is proper and necessary to take into consideration all its provisions. The mortgage first uses appropriate language describing the cattle conveyed, and transferring the title thereto to Trower's Sons, "its successors and assigns." Thereafter, and preceding the portion above quoted and relied upon by defendant's counsel, appear the following words: "Said property to remain and be kept on the premises above described until the full payment of the indebtedness hereinafter described, unless sooner marketed or removed by and with the written consent of the mortgagee or its assigns." Then follow the words above quoted: "When marketed, said cattle are to be shipped and consigned for sale to Trower's Sons," etc. The latter part of the mortgage relates to the rights of the parties in case of default in payment of the debt, or an unreasonable depreciation in value of the security, and provides for the sale of the property at public auction or private sale to the highest bidder, and particularly provides as follows: "Out of the avails thereof [the party of the second part, its successors and assigns] to retain the full amount of said obligation, with the interest thereon, according to the conditions thereof, together with all reasonable cost and expenses attending the same, rendering to said party of the first part, or his legal representatives, the surplus money, if any there shall be." All these provisions of the mortgage, taken together, seem to us to contemplate sales in two ways,—one, upon the written consent of the mortgagee or its assigns; and the other, at public auction, to satisfy the trust created by the instrument. If a sale of the first character be made, the cattle being marketed, by the consent of the mortgagee, prior to the full payment of the indebtedness, such marketing must have been made by Trower's Sons at the stock yards at Kansas City or St. Joseph, Mo., and the proceeds of such marketing must have been first applied to paying the commission to Trower's Sons for selling the same. When a sale of the character last referred to in the mortgage is made, there does not seem to be any provision for paying a commission to Trower's Sons. We are unable to construe this mortgage so as to create a lien upon the cattle conveyed

by it in favor of Trower's Sons, except, possibly, in the case where they are marketed by consent under the circumstances already pointed out. In the next place, it is clear that, if the indebtedness secured by the mortgage had been paid at its maturity, there could not have been any claim for commission. The cattle would have been released from the obligation of the mortgage upon such payment. It is also equally clear, construing the whole mortgage together, that there could have been no claim for a commission if the mortgagee, its successors or assigns, had been required to make a sale of the mortgaged property, pursuant to the power of sale conferred therein, for the purpose of paying the indebtedness secured thereby. The present case, as already observed, is an action to secure possession of the cattle by the mortgagee or its assigns for the purpose of subjecting them to the obligation of the mortgage. We entirely agree with the conclusion stated by the trial court on this issue, that the interest of Trower's Sons is inchoate only; it might never materialize; and we may further observe that the proceedings adopted by the institution of the present suit quite conclusively show that the claim for a commission by Trower's Sons under the mortgage would probably never materialize.

For another reason, also, there is no merit in the assignment under consideration. Sections 4172, 4174, Gen. St. Kan. 1889, provide that a misjoinder or defect of parties plaintiff is waived if not taken advantage of by demurrer or answer. Seip v. Tilghman, 23 Kan. 289; Thomas v. Reynolds, 29 Kan. 304; Coulson v. Wing, 42 Kan. 507, 22 Pac. 270, 16 Am. St. Rep. 503; Hurd v. Simpson, 47 Kan. 245, 26 Pac. 465. The only pleading filed by the defendant below was a general denial, and no attempt was made to defeat plaintiffs' right of recovery on the ground of defect of parties until the conclusion of plaintiffs' evidence, when, for the first time, objection was made because Trower's Sons were not made parties plaintiff. Under the statutes and decisions hereinbefore referred to, it was then too late.

There is, in our opinion, no merit in the contention that plaintiffs cannot maintain this action because a right of action had accrued to Trower's Sons, by virtue of their demand for the cattle and its refusal by defendant, prior to the institution of this suit. The transfer of the note by Trower's Sons to plaintiffs carried with it the mortgage given to secure the payment of the note. This transfer vested legal title to the cattle in the plaintiffs and warranted them in subsequently demanding possession thereof, and instituting this suit therefor. Section 3909, Gen. St. Kan. 1889, is as follows: "In the absence of stipulations to the contrary, the mortgagee of personal property shall have the legal title thereto and the right of possession." The debt represented by the note is the principal thing, and the mortgage is the incident following the debt wherever it goes. Whoever owns the note owns the mortgage, and whoever owns the mortgage owns the legal title to the chattels mortgaged. Burhans v. Hutcheson, 25 Kan. 625, 37 Am. St. Rep. 274; Insurance Co. v. Huntington, 57 Kan. 744, 48 Pac. 19; Ketcham v. Commission Co., 57 Kan. 771, 48 Pac. 29; Female Seminary v. Campbell,

60 Kan. 60, 55 Pac. 276. Proof of the indorsement and delivery of the note to the plaintiffs is, in legal effect, proof of the assignment of the mortgage to them. Such proof having been made, there was no necessity for proving an actual assignment of the mortgage. There is therefore no variance, as claimed by defendant's counsel, from the allegation of the complaint that the note and mortgage were transferred to plaintiffs.

The other assignments of error relate to the giving and refusing to give certain instructions to the jury. Counsel for defendant in their argument and brief have treated these assignments under one general head, namely, that, "under the undisputed facts of this case, the title to the cattle vested in Buckingham before Gillett's mortgage was executed, and the court erred in submitting the case to the jury upon the theory that the title did not pass until the cattle were received by Buckingham or his foreman at Alma," and that as a result the verdict cannot be sustained. The evidence tends to show that on or about November 1, 1898, Buckingham, who resided at Alma, Kan., went to Gillett's place, at Woodbine, near Herington, Kan., to look at a bunch of 500 steers which Gillett had there and wished to sell, and that Buckingham then and there examined the same; that afterwards, and on November 14th, at Kansas City, Mo., Gillett and Buckingham, who had had in the past mutual dealings in buying and selling cattle, came to an accounting, and found that Gillett owed Buckingham $10,000, for which he on that day gave Buckingham his check; that immediately thereafter, and on the same day, at Kansas City, Mo., there was a renewal of negotiations between them relating to the purchase by Buckingham of the 500 steers examined by him at Woodbine on November 1st; that, without any further inspection of the cattle, Buckingham then and there purchased of Gillett that bunch of steers, and also 650 other cattle, marked L S, said to be on feed at Patterson's Place, near Council Grove, Kan., for the aggregate consideration of $36,250 in cash; that Buckingham, in order to raise the money to pay Gillett, executed his several promissory notes and chattel mortgages conveying the total 1,150 cattle then purchased, to secure the payment of the notes, and, through the instrumentality of Gillett, secured the services of the Gillespie Commission Company, of Kansas City, to negotiate these notes. The mortgages described the cattle conveyed as located, 500 of them in Buckingham's feed lots, at Alma, Kan., whither they were to be shipped from Woodbine, and 650 of them, known as the "L S Cattle," at Patterson's Place, near Council Grove. It took some time for the commission company to negotiate these notes, but it was finally so far accomplished that it informed Buckingham on November 17th that a portion of the paper had been negotiated, and that Buckingham could have $10,000 on November 18th, $10,000 on November 19th, and $5,000 on November 21st. Gillett was informed of this arrangement, and thereupon agreed to have the cattle contemplated by the contract of sale shipped from Woodbine to Alma for Buckingham. In the meantime a check for $10,000 given by Gillett to Buckingham on November 14th in settlement of their

past-due transactions, which was drawn on the Abilene National Bank of Kansas, had been presented by Buckingham's local bank at Alma, in which he had deposited it, and been credited with the proceeds, and the same had been dishonored by the drawee. Buckingham, on demand of his local bank to make good the credit secured by the deposit of Gillett's worthless check, on November 18th took the first installment of $10,000, which he on that day received from the commission company, and caused the same to be deposited with his local bank at Alma, Kan., and took up Gillett's protested check. Buckingham left Kansas City for his home, at Alma, about midnight of November 18th, and met Gillett on the train, bound for his home, at Herington, Kan.,—50 miles further west than Alma. Just before leaving Kansas City, Buckingham had received a telegram from his foreman at Alma that 300 head of steers had arrived, and 200 more were on the way. These made up the total number of 500 steers, which, according to the contract of sale, Gillett was to ship from his cattle pens at Woodbine to Buckingham. Thereupon, after meeting Gillett on the train, relying on getting $10,000 from the commission company the next day, the 19th of November, and $5,000 on the 21st of November, according to the agreement, he delivered to Gillett his three checks, each for $5,000, drawn on the Bank at Alma,—two dated November 19th, and one dated November 21st. These amounted to $15,000, which, with the $10,000 appropriated by Buckingham on the 18th of November at Kansas City, in taking up Gillett's protested check of $10,000, made $25,000, which, it is claimed, was paid by Buckingham to Gillett on account of the purchase price of the cattle purchased by him on November 14th. The balance, it is claimed, was to be paid by Buckingham when he realized further on the loan negotiated through the commission company. In the meantime, on November 17th, Gillett, being then at Kansas City, purchased at the stock exchange there, through Trower's Sons, stock dealers, 311 steers; and on that day Trower's Sons shipped these steers to Gillett, consigning them to him at his home, at Herington, Kan. On the morning of the next day, November 18th, Gillett borrowed from Trower's Sons $15,060.93, and executed and delivered to that firm a negotiable promissory note payable to its order for that amount, and also executed and delivered to it a chattel mortgage to secure the payment of the note, conveying the same 311 steers purchased by him from Trower's Sons the day before; describing them in the mortgage as located and being in feed lots of Gillett at Herington, Kan. These 311 steers arrived at Herington on the morning of November 18th, and, by a letter to his foreman located at Herington, Gillett caused them to be unloaded and fed at Herington, and in the afternoon of that day (November 18th) to be shipped back over the same route they had come the night before (a distance of 50 miles) to Alma, consigning the same to Buckingham at that place. They arrived at Alma at 4 o'clock in the afternoon of November 18th, and were at that time taken possession of by Buckingham's foreman at that place. At about this juncture the foreman wired Buckingham, who was then at Kansas City, as already stated, that he had received

300 of the steers, and that 200 were on the way. The evidence shows that Gillett did not ship the other 200 steers from his pens at Woodbine, but purchased them elsewhere to make up the 500 supposed to have been at Woodbine, and contracted to be sold by him to Buckingham. The evidence is almost conclusive that Gillett, after buying the 311 steers at Kansas City, through Trower's Sons, determined to make them serve the double use of filling the description of the Trower's Sons mortgage executed on the morning of November 18th, locating them at Herington, and afterwards, by a quick transit back to Alma, to serve the purpose of a delivery to Buckingham under the terms of the contract of sale of November 14th between him and Gillett. It was claimed by plaintiffs at the trial that the steers replevied were the same as those mortgaged to Trower's Sons, and consigned on the 17th of November to Herington. The defendant made rather a perfunctory claim that the steers replevied were a part of the steers sold by Gillett to Buckingham on November 14th, being a part of the 500 said to have then been at Woodbine. This issue was fairly put to the jury, and found in favor of the plaintiffs, and no serious complaint is now made with reference to this finding. For the purpose of this case, therefore, it may now be assumed that the cattle replevied were the 311 steers purchased by Trower's Sons for Gillett on November 17th, and conveyed by him, in and by the chattel mortgage which was executed and delivered in the forenoon of November 18th, to Trower's Sons.

This brings us to a consideration of certain undisputed facts which are claimed by defendant to have vested title to the cattle in question in Buckingham prior to the execution and delivery of the mortgage to Trower's Sons. There is no claim that this mortgage was recorded, as required by the registration laws of the state of Kansas, before November 19th, and therefore no claim that Buckingham was affected by any constructive knowledge arising from such record. The claim of the defendant is that title to the cattle now in controversy was vested in him at the time Gillett, on the evening of November 17th, directed his foreman at Herington to unload the cattle there and feed them, and afterward to ship them to Buckingham at Alma; that this direction amounted to a specific appropriation of these cattle to the fulfillment of Gillett's contract of sale of November 14th. It is claimed, on the other hand, by the plaintiffs, that no title to the cattle vested in Buckingham until either he or his foreman at Alma actually received the same as a substituted delivery for the cattle which Buckingham purchased on November 14th, namely, those located at Woodbine, and that prior to Buckingham or his agent so receiving the same the mortgage in question had been executed and delivered to Trower's Sons, and $15,000 paid to Gillett by them for it, and that Buckingham had actual knowledge that the cattle in controversy had been so mortgaged to Trower's Sons prior to the time they were accepted by him or his foreman at Alma, Kan., in substitution for the cattle which he had agreed to take.

The trial court, in its charge to the jury, dealing with the theory that the cattle in question were the ones purchased by Gillett at Kansas City on the 17th of November, charged the jury as follows:

"If Mr. Gillett had certain cattle of this same kind and character at Woodbine about the 1st of November, and Mr. Buckingham saw them, and when they met again, on the 14th of November, Mr. Buckingham supposed he was purchasing those cattle, yet, if he did not get those cattle, but got certain other cattle which Gillett bought upon the market, and they were delivered to Buckingham before the rights of anybody else had attached, Buckingham would become the owner of those cattle; i. e. Mr. Buckingham not objecting, Mr. Gillett would have the right to acquire cattle of like kind and quality anywhere, and deliver them to Mr. Buckingham at his ranch in Alma, and, when accepted by Buckingham or his foreman, title would vest in Buckingham, provided rights, interests, or claims of somebody else had not attached before the cattle were delivered. * * * Consequently, in that view of the case, it is necessary that it be shown, in order to defeat Buckingham's title, that he was not a purchaser in good faith; in other words, that he either knew of the existence of the Gillett mortgage upon these cattle that were delivered to him, or that there existed certain circumstances that he knew that were sufficient to put an ordinarily prudent and careful man upon inquiry, which, if pursued, would lead him to knowledge of the mortgage. In my judgment, this is the vital and crucial question in this case: Did Mr. Buckingham have such notice of the existence of the Gillett mortgage upon the cattle in controversy? * * * If these were not the cattle which Mr. Buckingham saw at Woodbine, but were the cattle which Gillett bought on the 17th at Kansas City, and which he turned in to Buckingham on the 18th of November on his sale of cattle of a certain quality, kind, and age, then the title of Mr. Buckingham did not attach to the cattle until the delivery at Alma. * * * If you find from the evidence that before the mortgage from Gillett to Trower's Sons was recorded the cattle sued for were delivered to Buckingham, and that he, without notice of the mortgage, and in good faith, gave his checks for $15,000, a portion of which was to apply upon the purchase price, and that said checks were indorsed by Gillett, * * * and that said Buckingham has since been compelled to pay the same * * * [to innocent holders], in that event your verdict should be for the defendant."

The court further told the jury:

"Although you may find from the evidence that Buckingham knew from the time it was given of a mortgage from Gillett to Trower's Sons, yet, if he did not know that the cattle sold to him by Gillett were the same cattle covered by the mortgage before he gave Gillett his three $5,000 checks, then the mere fact that he had such knowledge of said mortgage would not authorize a verdict against him; in other words, it is not sufficient that Buckingham knew that a mortgage was being given or being prepared, from Gillett to Trower. The point in controversy is, did Buckingham, when he purchased these cattle, purchase them in good faith, or did he have notice that there was a mortgage upon the cattle that he was purchasing?"

From the foregoing excerpts taken from the charge of the trial court to the jury, and from the verdict as rendered by the jury, it is certain that there was a finding that Buckingham knew, or had reasonable ground to believe, that the very cattle in question had been mortgaged by Gillett to Trower's Sons, before he paid any money to Gillett on account of their supposed purchase by him. Without detailing the evidence, it is sufficient for the purposes of this opinion to say that there is abundant testimony justifying the conclusion reached by the jury,—that Buckingham or his agent knew that the cattle in question never came from Woodbine, but did come from Kansas City, and also that Buckingham knew that the same had

been mortgaged to Trower's Sons before they were received at Alma, and before the $15,000 was paid by Buckingham to Gillett therefor. The determination of this case, therefore, rests upon, first, the correctness of the proposition stated by the trial court,— that if the cattle in question were not the ones which Buckingham thought he was purchasing, namely, those in the cattle pens at Woodbine belonging to Gillett, then no title attached in favor of Buckingham to the cattle until the delivery of the same at Alma. By recalling the evidence already detailed, it will be found that the cattle were delivered to Buckingham's agent at Alma at 4 o'clock in the afternoon of November 18th, and that the money was paid by Buckingham to Gillett in the night of November 18th, while they were on their way from Kansas City to Alma on the train, so that no money was paid on account of the sale until after the actual delivery at Alma. It also clearly appears from the evidence that Gillett was to deliver the cattle at Alma, paying all freight, including that from Herington to Alma.

It is contended by defendant's counsel that Buckingham had been induced by Gillett to alter and change his position by the purchase of the cattle on November 14th, and that Buckingham acted on the strength of that purchase, executing and delivering his notes for negotiation in the sum of $36,250, and that one of the notes was actually negotiated November 16th. Suppose all this to be true; it has nothing to do with the transaction involved in the present case. Buckingham, in that transaction, bought 1,150 head of cattle then belonging to Gillett, as he represented, and located in Woodbine and Council Grove, Kan.,—not the cattle in controversy at all. Gillett on November 14th had no title to the cattle in controversy, and did not acquire any until November 17th. It is, in our opinion, far-fetched and entirely unwarrantable to try to affect Trower's Sons, or their assigns, with the effect of a transaction made before Gillett even acquired the title to the cattle mortgaged to Trower's Sons.

It is also urged that Gillett on November 17th was the absolute owner of the cattle in question, and on that day appropriated them to the fulfillment of his contract of November 14th with Buckingham, by writing a letter to his agent at Herington telling him that he (Gillett) had shipped 8 or 10 car loads of cattle that night, that would arrive at Herington in the morning, and directing him (the agent) to unload them, and feed and reload them, and ship to Buckingham, at Alma, and directing him to pay freight. This contention, in our opinion, is also without merit. There is no satisfactory evidence that Gillett himself intended, in good faith, to substitute these cattle for those purchased by Buckingham at Woodbine. All Gillett evidently was trying to do was to appear to be doing something of that kind. He was, as the sequel shows, attempting to perpetrate a great fraud on some one. Whether the victim in his mind was to be Buckingham or Trower's Sons is not apparent. He was evidently making an effort to dispose of the cattle to two persons at the same time, and it is fair to presume that he cared very little whose money he received, provided only he received it. If, indeed, it appeared that

Gillett did so intend to appropriate the cattle in question to the fulfillment of his contract of November 14th with Buckingham, even then there is no evidence that Buckingham on that day, or at any other time prior to the actual receipt by him or his agent of the cattle at Alma, in the afternoon of November 18th, agreed to any such substitution, or had any knowledge of Gillett's purpose to make any such substitution. He had purchased certain cattle pointed out to him, located at Woodbine, and certain others, represented to be at Council Grove, and had purchased no other cattle. Certainly Gillett could not, without Buckingham's consent, substitute other cattle for them.

It is, again, claimed that on the morning of the 18th of November, before the mortgage to Trower's Sons was executed, Buckingham applied $10,000 of the purchase money which he was owing Gillett to take up his own overdraft in the Alma National Bank, occasioned by Gillett's worthless check given him on November 14th, and subsequently deposited by him to the credit of his account in the Alma National Bank. It is claimed that this constituted a payment of $10,000 by Buckingham to Gillett for the cattle purchased on November 14th. Even so, it would be a payment for the cattle actually purchased, namely, those at Woodbine, for no others had been purchased; but, in our opinion, this transaction cannot be treated as a payment pro tanto to Gillett for any cattle whatsoever. The evidence does not disclose that Buckingham made this payment to the Alma National Bank as a result of any agreement with or direction by Gillett. On the contrary, the fact appears that Buckingham owed the Alma National Bank $10,000 on account of an overdraft, which, it is true, was occasioned by the dishonor of Gillett's check deposited there by him, and that Buckingham took the first $10,000 received from the commission house, which was his own money, and paid his own debt due the Alma National Bank. The evidence shows that Gillett was not even informed of the fact of such use of the $10,000, either at Kansas City, on November 18th, or on the train from Kansas City to Alma, when Buckingham delivered to him the three checks, each for $5,000. On the contrary, it appears that Buckingham was all the time urging Gillett to raise the money, and go to the Alma bank and take up his dishonored check. From these facts it appears not only that Buckingham did not treat this as a payment to Gillett on account of any cattle purchased, but that Gillett knew nothing about the same. There is therefore no such application as defendant's counsel contend for. The claim is nothing more, in our opinion, than an ingenious afterthought of counsel, and one to which Buckingham, in his evidence, gives no support.

The authorities cited by counsel relating to the passing of title to specific chattels when nothing remains to be done in the way of specifically appropriating the same are, in our opinion, inapplicable to the present case. They would be applicable if the cattle actually delivered were the ones which came from the pens at Woodbine. The general rule governing contracts of sale of personal property is that, if a delivery is to be made at a certain place, the

vendor's title is not devested until delivery is made at that place, and until delivery is so made the vendee has acquired no title. The contract of sale may be complete before then, but the sale is not complete until delivery is made according to the terms of the contract. Association v. Nipp, 6 Kan. App. 730–736, 50 Pac. 956. When the vendor by the terms of the contract is to pay the freight to the place of delivery, the place of delivery becomes the place of sale, and title is not devested until the transportation is at an end. Taylor v. Cole, 111 Mass. 363; Brewing Co. v. De France, 91 Iowa, 108, 58 N. W. 1087, 28 L. R. A. 386, 51 Am. St. Rep. 329; Association v. Nipp, supra. By the terms of the contract of sale of the Woodbine cattle, delivery was to be made to Buckingham at Alma, and the attempted substitution by Gillett of 311 cattle bought for him by Trower's Sons on November 17th for so many of the Woodbine cattle was made with the distinct understanding on the part of Gillett that he was to pay freight on the same to Alma, and, in point of fact, he paid the same. There is no doubt, in our opinion, that, under such state of facts, no title was intended to be vested in Buckingham to the cattle in question until they should arrive at Alma. Not only is this so, but, in our opinion, no title to the cattle in question could have passed to Buckingham until he or his agent knew that Gillett had substituted the 311 cattle for those actually purchased by Buckingham, and had consented to accept them as a substituted delivery. Manifestly, Buckingham would not have been obliged to take the 311 cattle shipped from Kansas City in fulfillment of a contract obligation to take a certain bunch of cattle pointed out to him, and located at Woodbine, Kan. The substitution of the former for a part of the latter was a matter of further agreement between the contracting parties, and, in the absence of any express agreement to that end, no implied one can arise until Buckingham or his agents knew of the substitution, and accepted the same as such. The evidence discloses no such knowledge or acceptance until Buckingham's agent actually received the cattle in question, which was at 4 o'clock in the afternoon of November 18th. Before that time, namely, on the morning of November 18th, Trower's Sons acquired title to the cattle by the mortgage in question, and Buckingham, as determined by the verdict in this case, knew of that fact. It follows that Trower's Sons' title was superior to that of Buckingham, and that plaintiffs, who stand on the title of Trower's Sons, have the superior right to the cattle in question. All the disputed questions of fact involved in this case were submitted by the trial court with proper instructions to the jury, and their finding was in favor of the plaintiffs; and, in the view we take of the propositions of law relied upon by defendant's counsel, there is no ground for disturbing the verdict of the jury as rendered.

The judgment of the trial court is therefore affirmed.