STATE NAT. BANK OF ST. LOUIS v. CUDAHY PACKING CO.

(Circuit Court, W. D. Missouri, W. D. January 4, 1904.)

1. BILLS AND NOTES—NEGOTIABILITY—FEDERAL COURTS—FOLLOWING STATE LAWS.

The negotiability of a note is a question pertaining to the law merchant, with regard to which federal courts are not bound by local decisions, unless predicated on a special statutory enactment defining the elements of a negotiable instrument.

2. SAME—STIPULATIONS IN NOTE.

Where a note was executed in Missouri, the fact that it provided that it should be paid at the office of the payees in Kansas City, Mo., did not render the note subject to the rulings of the Missouri courts as to its negotiability in an action thereon in the federal courts sitting in Missouri, in the absence of express legislation limiting the negotiability of such instruments.

3. SAME—TITLE MORTGAGES—TRANSFER—STIPULATIONS.

Where, in an action on a cattle note, it was agreed that plaintiff became the owner and holder for value of the note and mortgage, and on the back of the note was an indorsement that the mortgage securing it bore the amount of revenue stamps required by law duly canceled, which indorsement was signed by the payees, such stipulation and memorandum sufficiently indicated an intent to pass the mortgage as a part of the assignment of the note, without regard to the latter's negotiability.

4. SAME—CHATTEL MORTGAGES—ANIMALS—DESCRIPTION.

A chattel mortgage on cattle, describing them as 300 head of native territory and Texas four and five year old steers, was not objectionable for failure to distinguish between the territory and Texas steers, it being proved that the only principal difference between the two classes was that generally Texas cattle had long horns, while territory cattle sometimes had long horns and sometimes not.

5. SAME.

Where a chattel mortgage on cattle described them as 300 head of steers, "all branded P on the left hip and ⋈ on the left side," in the mortgagor's pasture, about 10 miles southwest of V., in the Cherokee Nation, Ind. T., and the evidence showed that cattle answering such descriptive brands and ages were in the pasture at that time, and that the pasture contained no other cattle, the description was sufficient.

6. SAME.

Where, in an action founded on a chattel mortgage on cattle, defendant offered prior mortgages claimed to have been given on the same cattle, but the description therein did not state the county, territory, or state where the cattle mortgaged were located, nor attempt to segregate the cattle covered by plaintiff's mortgage from the larger number attempted to be described in the mortgages offered, and the brands described were not the same, the mortgages were properly excluded.

¶ 1. State laws as rules of decision in federal courts, see notes to Griffin v. Overman Wheel Co., 9 C. C. A. 548; Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.

See Courts, vol. 13, Cent. Dig. § 979.

7. SAME—MORTGAGES—CONSTRUCTION.

Where a memorandum on the back of a chattel mortgage on cattle recited that the cattle were to be fed by the mortgagor during the term of the mortgage, and that at least three days before the maturity of the note secured thereby they should be shipped and consigned to the mortgagees, and when sold by them the proceeds should be applied, first, to the payment of the mortgagees' commissions, and the balance, or so much as necessary, to the satisfaction of the indebtedness, etc., but that if the cattle were not consigned to the mortgagees or sold by them the mortgagor should pay a commission of 50 cents a head, such agreement did not constitute the mortgagees the agents of an assignee of the note and mortgage for the purpose of selling the cattle for the assignee's benefit.

8. SAME—CONVERSION.

Where a mortgage on cattle provided that until default the mortgagor should keep the cattle in a particular place and take care of them at his proper cost and expense, and that in case of sale or attempt to sell or dispose of the same it should be lawful for the mortgagee or his assigns to take possession of and sell the cattle, and thereafter the mortgagees assigned the note and mortgage to plaintiff, and before the maturity thereof the mortgagors shipped the cattle to the mortgagees, by whom they were sold to defendant, who had constructive notice of the mortgage, defendant's purchase thereof constituted a conversion as against plaintiff.

C. H. Kohler and Fyke Bros., Snider & Richardson, for plaintiff.
Karnes, New & Krauthoff, for defendant.

PHILIPS, District Judge. This is an action for the conversion of 78 head of cattle, which the plaintiff claims were covered by a chattel mortgage, of date June 5, 1901, executed by Pumphry & Fleming to Tamblyn & Tamblyn, of Kansas City, Mo., to secure a note of even date therewith for $7,000, payable December 1, 1901. The plaintiff claims as purchaser of said note and the assignee of said mortgage, acquired June 10, 1901. The said mortgage was duly filed June 8, 1901, at Muskogee, in the Northern District of the Indian Territory, where the cattle were located, as by the laws of the territory required. The petition alleges that, in violation of the conditions of said mortgage, the mortgagors on the 11th day of August, 1901, shipped said cattle to said Tamblyn & Tamblyn as consignees at the stockyards in Kansas City, Mo., who on the 12th day of August, 1901, sold the same to the defendant company, which converted them.

The first contention on behalf of the defendant to defeat a recovery herein by the plaintiff is that the note in question is a nonnegotiable instrument, and therefore without a special assignment thereon the mortgage did not pass as an incident to the sale and transfer of the note. The note is as follows:

"$7,000.00                                      Kansas City, Missouri, June 5, 1901.

"December 1, 1901, after date, without grace, for value received we, or either of us, promise to pay to the order of Tamblyn & Tamblyn, at their office, Kansas City Stock Yards, Kansas City, Mo., seven thousand and no/100 dollars, with interest at the rate of eight per cent. per annum from maturity until paid, and in case legal proceedings are instituted to enforce the collection of this note, we agree to pay ten per cent. on the entire amount due as attorney's fees.                                      Pumphrey & Fleming.
"No. 3,581.                                      By Z. Pumphrey.
"Due Dec. 1, 1901.
"P. O. Vinita, I. T."

It is contended that the words, "in case legal proceedings are instituted to enforce the collection of this note, we agree to pay ten per cent. on the entire amount due as attorney's fees," destroys the negotiability of the note. I have long entertained the opinion that the better reasoned rule, more consonant with the importance of maintaining the negotiability of commercial paper, is that asserted by Judge Pardee in Adams et al. v. Addington et al., 16 Fed. 89, 4 Woods, 389, and recognized by Judge Brewer, when on this circuit, in Hughitt v. Johnson (C. C.) 28 Fed. 865, 866, and elaborately considered and expressed by Judge Taft in Farmers' National Bank v. Sutton Manufacturing Co., 52 Fed. 191, 3 C. C. A. 1, 17 L. R. A. 595, which maintain the negotiability of such a note, as such condition does not attach until after the maturity of the note, and is collateral in its character, and the amount payable on the face of the note at the time of its making and maturity, when presumably it will be paid, is certain and fixed. As said by Judge Taft:

"A stipulation as to what shall be done in case the bill is not paid does not affect its character as a financial medium before it is dishonored. As soon as the bill is dishonored it loses its value as a negotiable instrument, for thereafter an indorsee gains no better title than his transferrer. It is unreasonable to hold that the negotiability of a bill is lost because of a provision having no effect while it remains negotiable."

It is to be conceded to the defendant that the Supreme Court of this state holds that such provision in the note destroys its negotiability. First National Bank v. Gay, 63 Mo. 33, 21 Am. Rep. 430; Samstag et al. v. Conley et al., 64 Mo. 476; McCoy v. Green, 83 Mo. 626.

As this question pertains to the law merchant, belonging within the larger domain of general jurisprudence, the local ruling is not binding on this court, unless it be predicated of some special statutory provision defining the elements of a negotiable instrument, where the local statute, by its definition, embraces terms similar to those found in the note in question as affecting its negotiability. This aspect of the vexed question was discussed by Judge Thayer in Second National Bank v. Basuier, 65 Fed. 58, 12 C. C. A. 517, 27 U. S. App. 541. It is quite apparent from the opinion of the learned judge that he followed the local ruling of the Dakota court on the ground that it was a Dakota contract, where the local statute, by its express terms, declared that the condition expressed in the note under review destroyed its negotiability.

While it is true that the note in question here provided for its payment "to the order of Tamblyn & Tamblyn, at their office, Kansas City Stock Yards, Kansas City, Mo.," this did not take it out of the domain of general jurisprudence as affecting the law merchant respecting negotiable instruments, in the absence of any express legislation by the state limiting the negotiability of such instruments.

Moreover, it is a sufficient answer to this objection of the defendant to say that the written stipulation of the parties herein, filed in this court on the 2d day of December, 1903, by which it was "agreed by and between the plaintiff and the defendant herein that the plaintiff became the owner and holder for value of the note and mortgage set

out in plaintiff's petition herein on or before the 10th day of June, 1901, and has been at all times since and now is the owner and holder thereof," concludes the defendant against the contention that the mortgage did not pass simultaneously with the transfer of the note on the 10th day of June, 1901, before the maturity of the mortgage debt. After this stipulation was read by plaintiff's counsel, without objection, but before the final submission of the cause to the court, defendant's counsel stated that the word "mortgage" was unintentionally inserted in the stipulation; that defendant's counsel understood from plaintiff's counsel that the purpose of the stipulation was only to avoid the trouble and expense of taking depositions to prove that the plaintiff so became the purchaser for value and the owner of the note; and that counsel had no recollection as to whether or not he read the stipulation. After hearing the statements of the counsel, who participated in this stipulated agreement on behalf of the plaintiff and the defendant, the court concludes that the stipulation was fairly obtained and signed, and that at the stage of the trial when this objection was raised the defendant ought not to be allowed to recede therefrom.

It may not be unimportant in this connection to add that on the back of the note in question occurs the following indorsement: "The mortgage securing this note bears the amount of revenue stamps required by law, duly canceled. Tamblyn & Tamblyn." This direct reference to the mortgage securing the note would indicate that it was the intention of the parties that the security passed with the note, as it is the existence of the fact of a chattel mortgage taken by such cattle commissionmen that gives vendibility to such notes.

At the trial defendant objected to the mortgage in question on the ground that the mortgage described the cattle as "300 head of native territory and Texas four and five year old steers," on the ground that there is a distinction between native territory and Texas steers. The evidence on this issue only tends to show that about the principal difference between the two classes of cattle is that generally Texas cattle have long horns, and that sometimes territory cattle have long horns and sometimes not. As to whether or not the horns of these cattle varied the evidence does not show.

The accepted requirement respecting the sufficiency of description of such property in a chattel mortgage is very aptly expressed in Alferitz v. Ingalls (C. C.) 83 Fed. 964, as follows:

"The general rule is that the description in a chattel mortgage need not be so specific and certain that the property might be identified by the description alone. If the description of the personal property contained in the chattel mortgage is such as will enable third persons to identify the property, aided by the inquiry which the mortgage itself indicates and directs, the mortgage, when recorded, is constructive notice to all third parties."

As said by Chief Justice Cooley in Willey v. Snyder, 34 Mich. 60:

"Written descriptions of property are to be interpreted in the light of the facts known to and in the minds of the parties at the time. They are not prepared for strangers, but for those they are to affect—the parties and their privies. A subsequent purchaser or mortgagee is supposed to acquire a knowledge of all the facts, so far as may be needful for his protection, and he purchases in view of that knowledge."

The controlling features of the description given in the mortgage in question are that the 300 head of steers were "all branded P on the left hip and ⊓ on the left side, various marks; in our pasture about ten miles southwest of Vinita in the Cherokee Nation, Indian Territory, and are to be kept here and grazed during the summer and shipped to meet note herein mentioned." The evidence does not disclose that there were any other cattle with any other brands in the pasture. But the evidence does show that in the pasture were the Pumphrey & Fleming cattle, with the said descriptive brands and ages.

There is no ground of doubt on the evidence that the 78 cattle shipped from this pasture on August 11, 1901, and bought by the defendant in the stockyards on August 12, 1901, were part of the cattle covered by the plaintiff's mortgage. The answer states that "the defendant avers that on the 12th day of August, 1901, it purchased of Tamblyn & Tamblyn in the open market in Kansas City, Missouri, seventy-eight (78) head of cattle, weighing 76,430 pounds, at $3.05 per 100, or $2,331.11, and on August 12, 1901, the defendant paid Tamblyn & Tamblyn the full sum of $2,331.11." While this is somewhat evasive, its import is that the defendant bought the cattle in question, or the statement had no meaning or relevancy, and the subsequent matters pleaded by way of avoidance confirm such conclusion.

The defendant at the trial, for the purpose of showing the evidence of a prior mortgage on the cattle in question, offered in evidence a copy of a mortgage from Pumphrey & Fleming to Tamblyn & Tamblyn, of date April 11, 1901, to secure the payment of the sum of $8,100. Plaintiff's counsel objected to this evidence for the reason that the description did not give any locality to the cattle, as to the county, state, or territory where the cattle were being kept, nor show that they were the cattle in controversy. The matter ended there without more. But, waiving this, the mortgage is clearly inadmissible. While the caption states that "We, Pumphrey & Fleming, of Cherokee Nation, Ind. Ter., party of the first part," the descriptive part of the mortgage does not state in what county, territory, or state the property was located. It specified "300 steers described as follows, 300 head of four year old steers, branded ⊓ left hip, P left hip, worth $34.00, and the increase of and from said cattle of whatsoever kind and class that may hereafter arise from said cattle, and all additions and accretions to said lot of cattle. Said cattle are now located in our pasture twelve miles east of Vinita, and are to be kept here and grazed during the spring and summer and shipped to meet note herein mentioned." The note described was for $8,100, dated April 11, 1901, payable in 180 days, with interest thereon at the rate of 8 per cent. per annum from maturity.

We are not advised whether the Vinita where the cattle were located was in the Indian Territory or Schuyler county, Mo. If it was intended to be Vinita in the Indian Territory, the description placed the cattle 12 miles east of Vinita, whereas the cattle in question were in a pasture 10 miles a little south of west of Vinita, 22 miles apart. The brands given in the mortgage of April 11, 1901, are entirely dif-

ferent from those in the mortgage under which the plaintiff claims. The former gives the brands as ꟼ left hip and P left hip, whereas the cattle in question were branded P left hip and ꟼ left side.

The same incidents occurred on the offer in evidence by the defendant of another mortgage from said Pumphrey & Fleming to said Tamblyn & Tamblyn, of date April 30, 1901. The description of the property given in this mortgage is as follows: "Two hundred and fifty (250) steers, described as follows: 250 four year old steers, branded ꟼ left shoulder and P left hip. * * * Said cattle are now located in our pasture ten miles west of Vinita, and are to be kept here and grazed during the spring and summer, and shipped to meet note herein mentioned." The note was for the sum of $6,750, dated April 30, 1901, payable in 180 days, with interest at the rate of 8 per cent. per annum from maturity. No county, state, or territory is given for the location of the cattle, and the brands given are different from those given in the mortgage in question. The brand is ꟼ left shoulder and P left hip, whereas the cattle in the plaintiff's mortgage, as already shown, were branded P on left hip and ꟼ on left side. And, even if the brands corresponded, the mortgage offered by the defendant would be bad, for the reason that the evidence shows, without contradiction, that there were then 294 head of cattle in the pasture described in the plaintiff's mortgage, whereas the mortgage offered by the defendant covered 250 head of cattle. There being nothing, therefore, to distinguish the 250 head from the larger mass of 294 cattle, it was fatal to the mortgage. Northwestern Bank v. Freeman, 171 U. S. 620, 628, 19 Sup. Ct. 36, 43 L. Ed. 307; Stonebraker et al. v. Ford et al., 81 Mo. 532.

On the back of plaintiff's mortgage occurs the following memorandum:

"All of said cattle, as herein mentioned, are to be held in said pasture and fed by the mortgagor during the term of this mortgage and at least three days before the maturity of the note herein mentioned they shall be shipped and consigned to Tamblyn & Tamblyn at the stock yards at Kansas City, Mo., and when sold by them the proceeds thereof shall be applied, first in payment of the usual and customary commission to said Tamblyn & Tamblyn for selling the same, and the balance, or so much thereof as may be necessary, shall be applied on the indebtedness hereinbefore mentioned. If said cattle or any part thereof be consigned to or sold by any persons, except Tamblyn & Tamblyn, then said mortgagee shall be paid the proceeds of said sale and a commission of fifty cents per head on all the above-described cattle so sold. Provided always, and these presents are upon this express condition, that said parties of the first part shall pay or cause to be paid unto the said party of the second part, its successors or assigns, the commissions heretofore stated and agreed upon, and the aforesaid indebtedness."

This memorandum is not referred to in the body of the mortgage proper, nor is it signed by either of the parties. But conceding that the memorandum comes within the rule of the "eight corners" of the instrument, is the contention of defendant's counsel tenable that its effect was to constitute Tamblyn & Tamblyn the agent of the plaintiff, the assignee of the mortgage for the sale of the cattle, in so far as concerns the defendant, which purchased them in open market? The court cannot accept this contention. Its sensible purport is that it only accorded to the mortgagee, Tamblyn & Tamblyn, as against

the mortgagors, the right to have the cattle when shipped to the market at the instance of the mortgagee, in conformity to the requirements of the mortgage, consigned to Tamblyn & Tamblyn, to enable them to reap the benefit of the commissions on the sale, and, if shipped by the mortgagors elsewhere, then they should nevertheless be bound to the mortgagee for the commissions. When Tamblyn & Tamblyn, the mortgagees, sold and transferred the mortgage for value to the plaintiff, whatever rights or interest therein they had passed to and vested in the assignee. Thereafter Tamblyn & Tamblyn had no right whatever to direct or control the shipment or sale of the cattle, or to receive the purchase money, or exact any commissions as against the assignee, who did not sell through Tamblyn & Tamblyn. The last paragraph of the mortgage itself directs that "until default be made as aforesaid, or until such time as the said party of the second part shall deem itself insecure as aforesaid, the said parties of the first part to continue in the peaceable possession of all said goods and chattels, all of which, in consideration thereof, he engaged shall be kept in as good condition as the same now is, and taken care of at his proper cost and expense." And by the opening clause of said memorandum it is provided that "all of said cattle, as herein mentioned, are to be held in said pasture and fed by the mortgagor during the term of this mortgage, and at least three days before the maturity of the note herein mentioned they shall be shipped," etc. Neither the mortgagors nor Tamblyn & Tamblyn, after the transfer of the note and mortgage to the plaintiff, without the direction and consent of the plaintiff, had any right, on August 11, 1901, when the note and mortgage did not mature until December 1, 1901, to ship and sell the cattle, as was done. By the express provisions of the mortgage it is declared and agreed "that in case of sale or disposal, or attempt to sell or dispose, of the goods and chattels hereby mortgaged, or a removal of, or attempt to remove, the same from the county aforesaid, * * * then and thenceforth it shall be lawful for the said party of the second part, its executors, administrators or assigns, * * * to enter upon the premises of the said parties of the first part, or any other place or places wherein said goods and chattels aforesaid may be, to remove and dispose of the same and all the equity of redemption of the said parties of the first part at public auction or private sale," etc. Inasmuch as the assignee and holder of the note and mortgage neither directed nor assented to the removal of the cattle from the pasture on the 11th day of August, 1901, such removal and sale were unauthorized by the mortgage; and the removal, therefore, constituted a breach of the condition of the mortgage, which entitled the plaintiff, as assignee, to take possession of the cattle. That instant the plaintiff became the special owner of the cattle, and Tamblyn & Tamblyn in selling, and the defendant in buying, severally committed an act of conversion as against the plaintiff. The purchaser bought at his peril as to who was then the rightful owner of the cattle. Having constructive notice of the existence of the mortgage, the purchaser did not even inquire to ascertain whether Tamblyn & Tamblyn held the note and mortgage during the negotiability of the note. Such

a purchaser bought at its peril. Any other rule, it seems to the court, would destroy the commercial value of the note and the security. It would place the assignee at the mercy of the trickery of the mortgagors and assignors, and would give a perfect immunity to any purchaser under them who might see fit to shut his eyes and make no inquiry as to who was the holder of the note and the security, or to look to see where the proceeds were applied.

Tamblyn & Tamblyn, with characteristic hardihood and indifference to business integrity, not only sold the cattle after they had transferred the note and mortgage to the plaintiff for value, before the time limited in the mortgage, without the direction or knowledge of the assignee, but out of the proceeds pocketed their commissions, and appropriated the remainder to a debt not secured by this mortgage. As we can assume that the plaintiff bank discounted the note in question on the faith of the mortgage security, which imposed upon the mortgagor the obligation to keep and feed the cattle at the mortgagor's expense until the maturity of the mortgage, or three days before that time, the bank presumably expected that the cattle would be so kept until the maturity of the debt, gaining flesh, and thereby enhancing the value of its security.

This view, taken of the effect and construction of said memorandum on the mortgage, is in accord with that taken by Judge Caldwell, speaking for the Court of Appeals, in Swift v. Bank of Washington, 114 Fed. 643, 52 C. C. A. 339. In that case the purchaser undertook to justify on the ground that it had purchased the mortgaged cattle from the mortgagor and paid the purchase money, and received a receipt of release of the mortgage, and that the mortgagees, McAllister & Co. (just as in the case at bar), were made the agents of the holder of the note, and were authorized to receive payment. The mortgage contained the following provision:

"When marketed, the consent of the second party having been first obtained, said property shall be consigned to the second party at the Kansas City Stock Yards, Kansas City, Kansas, or Kansas City, Missouri, and the proceeds applied to the payment of the above-mentioned indebtedness, the surplus being paid to the first party."

The court said:

"This provision is commonly found in mortgages taken by commission merchants. It is designed to secure to them the commissions on the sale of the property. To this end, the mortgagor in this case covenanted that when the cattle were ready for market he would consign them to the mortgagees, and apply the proceeds of the sales to the payment of the mortgage indebtedness. There is no intimation here that the mortgage debt is to be paid to any one but the lawful holder thereof. Another and conclusive answer to the defendant's contention is that the cattle were not disposed of in the manner contemplated by this clause."

After discussing some provisions peculiar to that mortgage, the court further said:

"There is nothing in this clause of the mortgage which lends any support to the contention that McAllister & Co. had authority to receive payment of the mortgage debt after they had sold and transferred it."

In Buckingham v. Dake et al., 112 Fed. 258, 262, 50 C. C. A. 492, Judge Adams, speaking for the Court of Appeals, respecting a simi-

lar contention, where the mortgage provided that "when marketed said cattle are to be shipped and consigned for sale to Thomas Trower's Sons," with provisions relating to the rights of the parties in case of default in the payment of the debt, or an unreasonable depreciation in the value of the security and the like, and providing for sale of the property at public auction or private sale, to the highest bidder, and for the payment of the avails, etc., said:

"All these provisions of the mortgage, taken together, seem to us to contemplate sales in two ways—one upon the written consent of the mortgagee or its assigns, and the other at public auction, to satisfy the trust created by the instrument. If a sale of the first character be made, the cattle being marketed, by consent of the mortgagee, prior to the full payment of the indebtedness, such marketing must have been made by Trower's Sons at the stock yards at Kansas City, or St. Joseph, Mo., and the proceeds of such marketing must have been first applied to paying the commission of Trower's Sons for selling the same. When a sale of the character last referred to in the mortgage is made there does not seem to be any provision for paying a commission to Trower's Sons. We are unable to construe this mortgage so as to create a lien upon the cattle conveyed by it in favor of Trower's Sons, except, possibly, in the case where they are marketed by consent under the circumstances already pointed out. In the next place it is clear that, if the indebtedness secured by the mortgage had been paid at its maturity, there could not have been any claim for commission. The cattle would have been released from the obligation of the mortgage upon such payment. It is also equally clear, construing the whole mortgage together, that there could have been no claim for a commission if the mortgagee, its successors or assigns, had been required to make a sale of the mortgaged property, pursuant to the power of sale conferred therein, for the purpose of paying the indebtedness secured thereby."

The last suggestion of Judge Adams presents the state of the case under review. The cattle having been sold before the maturity of the debt, and before the time contemplated by the mortgage itself, in defiance of the rights of the assignee of the debt and mortgage, entitling the assignee to sue in trover for the conversion, the right of Tamblyn & Tamblyn to any commission was gone, and with it their right to sell and receive the proceeds of the sale. In other words, it is a contradiction in terms to speak of Tamblyn & Tamblyn as constructive agents for the assignee in aiding in the conversion of the property against the consent and without the knowledge of the holder of the note and mortgage. As said by Judge Caldwell in Swift v. Bank of Washington, supra:

"The owner of the mortgage debt owns the lien as an incident to the ownership of the mortgage debt, and he alone can discharge the lien. This was the law, which the defendant was bound to know. * * * If the defendant desired to have the cattle released from the lien of the mortgage, he should have required the production and cancellation of the note the mortgage was given to secure."

The court finds from the evidence that at the time and place of the conversion the market value of the cattle was $2,331, for which amount judgment will go for the plaintiff. As under the statute the court may or may not allow interest on said sum from the date of the conversion, it will exercise its discretion in favor of the defendant.