JOHN HANNON v. BENNETT TAYLOR *et al.*
No. 8157.

1. INDIAN LANDS—*Descent.* The descent of lands patented to a Shawnee Indian under the treaty of May 10, 1854, is to be determined by the laws and rules established by the tribe.

2. TITLE BY INHERITANCE—*Power of Legislature.* Laws giving title to lands by inheritance are purely arbitrary, and the law-making power may cast the descent on whomsoever it will, or provide that, at the death of the owner, the whole estate shall go to the tribe, state, or other sovereignty.

3. ———— *Two Deeds Construed—Nearest of Kin Takes the Whole Estate.* Where a Shawnee Indian, owning lands patented to him under the treaty of 1854, died in 1862, unmarried and without issue, leaving as his nearest relatives a half-brother and the widow and child of a deceased half-brother, *held,* that a deed executed in 1862 by the surviving half-brother, accompanied by certificates of the two chiefs, showing that he was the only surviving heir of the patentee, and upon such certificates approved by the secretary of the interior, under which the defendants received and held possession of the land for more than 25 years, passed a full title under the Shawnee law in force at that time as disclosed by the evidence in the case, and that a deed executed by the daughter and heirs of the widow of the deceased half-brother in 1887, though approved by the secretary of the interior, conveyed no title.

1—57 KAS.

Hannon v. Taylor.

*Error from Wyandotte District Court.*
*Hon. O. L. Miller, Judge.*

AFFIRMED.                                    OPINION FILED JUNE 6, 1896.

STATEMENT BY THE COURT.

THIS action was brought by John Hannon against the defendants in error to recover possession of the undivided half of a tract of 166.95 acres of land adjoining the city of Argentine, in Wyandotte county, in the possession of the defendants, and rents and profits thereof received by them. The defendants denied that the plaintiff had any · title thereto. A patent for the land was issued by the United States to James Blacksnake, a Shawnee Indian, under the provisions of the treaty concluded with the tribe on the 10th day of May, 1854. The patent is dated December 28, 1859. Blacksnake, the patentee, died in 1862, unmarried and without issue. The defendants claim title to the whole of the land under a deed from William Williams, a half-brother of James Blacksnake, to A. J. Gabbart and A. H. Baldwin, dated July 28, 1862, and approved by the secretary of the interior on January 11, 1869. The plaintiff claims title to the undivided half under a deed from Ko-to-wah-cum-se, a daughter of Robert Williams, also called George Williams, and the heirs of Pish-e-qua-pe-a-se, his widow. Robert Williams was a brother of William Williams, under whom the defendants claimed, and a half-brother of James Blacksnake. Robert Williams died in 1859, before the death of James Blacksnake. The patent issued to James Blacksnake contained a provision that " the said tract shall never be sold or conveyed by the grantee or his heirs without the consent of the secretary of the interior for the time being." The rules prescribed by

the secretary of the interior for the conveyance of lands assigned in severalty to Indians within the territory of Kansas required that the conveyance should be executed in the presence of two subscribing witnesses, and acknowledged before the agent within the limits of whose agency the reservee resided, and be accompanied by " a certificate signed by two of the chiefs of the tribe to which the reservee belongs, setting forth that the grantor is the identical individual to whom the land was originally granted, or, in case the original reservee be dead, that the grantor, or grantors, as the case may be, are the only heirs surviving of the original reservee ; that he, she, or they, as the case may be, are severally of age and competent to manage his, her or their affairs, and to dispose of his, her or their property, and that they think it advisable that the land should be sold." The rules further prescribe that, if the original reservee be dead and a conveyance be executed by fewer than all his heirs, it must be accompanied by a copy of judicial proceedings showing that partition has been made by a court having jurisdiction thereof. The deed to Gabbart and Baldwin was executed before the Indian agent and accompanied by a certificate signed by Charles Bluejacket and Eli Blackhoof, the two chiefs of the Shawnee tribe of Indians, certifying that William Williams, the grantor, was the brother and sole surviving heir of James Blacksnake, deceased ; that he was a member of the Black Bob band of the Shawnee tribe, with the other requisites, under the rule prescribed by the secretary. The consideration named in the deed is $835. The deed under which the plaintiff claims was executed to him on the 13th day of October, 1887, by Ko-to-wah-cum-se and others as heirs of James.

Blacksnake, and purported to convey the undivided half only of the land. For this deed the plaintiff paid them $5,008.50. When the deed was presented to the secretary of the interior for approval, it was accompanied by a certificate of Johnson Blackfeather and David DeShane, the two chiefs of the Shawnee tribe, certifying that the parties who executed the deed were the only heirs of James Blacksnake, deceased, except William Williams, who had theretofore conveyed his interest in the land, with the other requisite statements. A quitclaim deed from Ko-to-wah-cum-se to Bennett Taylor, dated June 23, 1887, for a consideration of $415, was also presented to the secretary for his approval. The deed to the plaintiff was accompanied by many affidavits. An investigation was instituted by the department for the information of the secretary. Before approving either deed, an inspector was appointed who examined the land, and also took the testimony of numerous witnesses, and made a long report recommending the approval of the deed to Hannon. On the report of this inspector and the recommendation of the commissioner of Indian affairs, the deed to Hannon was approved by the secretary of the interior March 3, 1888. The consideration was paid, and distributed among the grantors, according to their interests as then determined. The trial court made very full findings of fact, which are copied in the brief of counsel for plaintiff in error, covering 64 printed pages. As a conclusion of law, the court held that the plaintiff had no title, and gave judgment for the defendants. The plaintiff brings the case here for review. Such other facts as are deemed essential to an understanding of the questions decided are stated in the opinion.

*L. B. & S. E. Wheat,* for plaintiff in error.

*Hutchings & Keplinger,* for defendants in error Baldwin and Taylor.

*A. A. Hurd, Robert Dunlap,* and *W. Littlefield,* for defendants in error *K. C. T. & W. Rly. Co.* and *A. T. & S. F. Rld. Co.*

The opinion of the court was delivered by

ALLEN, J. : Although we have before us a record covering 1,842 pages, and briefs containing nearly 300 pages, and although many errors are alleged by counsel for the plaintiff in error and discussed at great length, and although many defenses are insisted on by counsel for defendants in error, the view we take of the case and the conclusions reached reduce it to a comparatively small compass. A very great number of rulings of the court of which the plaintiff in error complains related to the admission and rejection of testimony. The case was tried mainly on depositions and other written evidence, and we think counsel for plaintiff in error are right in claiming that substantially all of the testimony bearing on the law governing the descent of lands belonging to members of the Shawnee tribe of Indians is contained in the depositions and writings, which this court is required to examine and consider as though the question were first submitted here — it must weigh conflicting evidence, and determine the disputed question of fact for itself. We shall therefore disregard all rulings of the district court as to the admissibility of testimony, and consider all that was offered that we deem competent and material, without reference to the rulings of the trial court.

Complaint is made of the refusal of the court to pass

upon exceptions to the depositions before the trial was commenced. It appears that, after proceeding for a short time with the reading of the depositions, the court offered to set aside the trial so far as it had proceeded, and to hear the exceptions to the depositions if the plaintiff desired, to which action the defendants consented, but the plaintiff declined to have the action taken, claiming that the defendants had waived all exceptions to the depositions. While it was error for the court to refuse to pass upon the exceptions when requested so to do before the commencement of the trial, we do not think the action of the court and the defendants in reference thereto amounted to a waiver on the part of the defendants of their exceptions; but, at all events, this matter appears to us now altogether unimportant, for we shall consider all competent evidence to be found in the depositions.

There was some conflict in the evidence as to the relationship of the parties, but on this question the findings of the court are favorable to the plaintiff. We deem it unnecessary to trace the relationship of all of the parties under whom the plaintiff claims to James Blacksnake, the patentee. It is sufficient to say that they are the heirs of Robert Williams, his half-brother, and the real question decisive of the case is, whether or not these heirs had, at the time they executed the conveyance to Hannon, a subsisting half interest in the lands. The question as to who are the heirs of the deceased Shawnee Indian must be determined by the laws, usages and customs of the Shawnee tribe of Indians. (*The Kansas Indians*, 5 Wall. 737; *Brown v. Steele*, 23 Kan. 672.) Very much of the great mass of testimony before us bears on the question as to what the Shawnee law or custom was. If Robert

1. Indian lands —law of descent.

Williams, as well as William Williams, had survived his deceased half-brother, James Blacksnake, it is clear that the two half-brothers would have inherited equally. The plaintiff contends that the widow and child of Robert Williams, who died before James Blacksnake did, took the same share of his estate that Robert Williams would have taken if living. On behalf of the defendants, it is claimed that in such a case the whole estate went to the nearest of kin ; that Pish-é-qua-pe-a-se, the widow of Robert Williams, could not inherit from ·James Blacksnake in any event, because she was not of his blood, and that Ko-to-wah-cum-se, the daughter of Robert Williams, was one degree further removed from Blacksnake than the living half-brother, and, therefore, that she could not claim any part of his estate.

The evidence shows that prior to the treaty of 1854 the Shawnees never owned land in severalty, and, therefore, did not and could not have any laws, usages or customs with reference to the transmission by descent of title to lands. Title to land, in the sense it is used in our law, was never conceived of by the primitive Indians. The idea of absolute 2. Source of the idea of absolute ownership for all time to come of a portion of the face of the earth by an individual is the invention of civilized man, and the rules and principles adopted, under which the right of future occupants and owners is made to depend on the will of the present owner, or on relationship to him by blood or marriage, never suggested themselves to the minds of any primitive people. By the savage, occupancy for the time being is all the right to the face of the earth recognized. It is only as they learn, through contact with the whites, the advantages to be gained through paper titles to the soil,

that the Indians come to understand and comprehend the meaning of individual ownership and the advantages of inheritance. The patents issued under this treaty were not executed until 1859, and not delivered until 1860, but the allotment was made in 1857. As James Blacksnake died before the 28th day of July, 1862, there were only five years for the enactment of laws or the growth of customs governing the descent of real property before the descent was cast by the death of Blacksnake. This case must be determined by the laws in force in 1862:

David Daugherty, a witness for the plaintiff, testified that a meeting of the Shawnees was held at Chillicothe, Johnson county, immediately after the allotment, for the purpose of determining when and how their lands would go in case of the death of an Indian; that he was present at the meet-

3. Evidence re-lating to Shawnee laws and customs.

ing; that he lived three-quarters of a mile from the place where it was held, and went back and forth; that the council was in session at the time; that Captain Parks was the principal chief, and Blackhoof the second chief; that right after the meeting Parks got up on a wagon, and explained to the people what they had done, and that in case of the death of an Indian the property would go to the nearest of kin. The witness explains his understanding of the meaning of the term, and testifies that Captain Parks's own estate was divided between his children and grandchildren. No record was introduced in which the proceedings of this council meeting were recorded, and whether any record was in fact made is not shown. The first entry on the subject appearing on the records produced is as follows:

" Resolution of the Council, first Monday, Decem-

ber, 1868 : Resolved, that the property, personal as well as real estate, of a deceased member of the Shawnee tribe of Indians, shall descend to a member or members of said Shawnee tribe of Indians who is or are of the nearest of kin by blood to deceased, and none others ; but if deceased have no relative or relatives by blood who is or are members of said Shawnee tribe of Indians, the property, personal as well as real estate, shall revert to the Shawnee tribe of Indians, and be disposed of, and proceeds applied for the benefit of said Shawnee tribe of Indians as the Shawnee Council may direct.     Approved this first Monday, December, 1868.                 GRAHAM ROGERS.

  "Attest : S. M. CORNATZER, *Council Clerk.*"

The next action of the council appearing of record, affecting the law governing the descent of property, was on the 8th day of May, 1889, when an act was passed, or adopted, declaratory of the Shawnee law governing the descent of lands, and also of the power of the chiefs in certifying to the heirship of lands. This act is favorable in all respects to the contention of the plaintiff.   It denies that the chiefs ever had power to determine who were the heirs of a deceased Indian, or to issue any certificate which should have the effect to defeat the claim of the real heirs, and asserts that the law was, and always had been, that the descendants of a deceased brother took the same share of the estate of a deceased brother, or half-brother, that a surviving brother would take.   This act, or resolution, was adopted by a full council, and signed by both chiefs and all the councilmen.   This meeting of the council, however, it will be noticed, was held after the execution and approval of the deed to the plaintiff, and after the commencement of this action, the petition in this case having been filed on the 19th day of November, 1888.   On the 16th day of January, 1890, another meeting of the council was

held, at which the claims of the Indians under whom the plaintiff claims were presented for examination and consideration of the council, and a finding was made and signed by both chiefs and all members of the council showing the relationship of the parties to be as the plaintiff claims, and determining that they were heirs to one-half of the land in controversy. There is oral evidence to the effect that the law of Kansas governing the descent of lands was adopted, but at what date is not shown. The evidence, so far as it goes, indicates that this action was not taken until after descent was cast by the death of Blacksnake.

Many persons who were or had been chiefs or members of the council were examined, and testified by deposition with reference to the Shawnee laws and customs. They all stated that where an Indian died leaving neither widow or issue, nor father or mother, his lands would go to his nearest kin or nearest relation. But when their attention is directed to particular cases they seem to recognize the right of inheritance by representation of those related in a more remote degree, and deny that the nearest of kin is entitled to inherit the whole to their exclusion. Their testimony indicates that grandchildren took by representation with children of a deceased person, and that nephews and nieces inherited the share which their deceased parents would have taken if living, although there were surviving brothers and sisters. The testimony of these witnesses is not very satisfactory. The able and adroit counsel who examined them succeeded in extracting contradictory answers. The counsel conducting the examination appears to have had little difficulty in obtaining the answer he sought. The witnesses were wholly unable to cope with the refinements invented by counsel in their in-

quiries concerning Shawnee laws of real property.
Counsel on either side may now point with a fair de-
gree of confidence to much testimony supporting al-
most any conceivable theory as to the Shawnee law of
descents.   We must view all this testimony in the
light afforded us by our knowledge of the state of the
tribe at the time, the number of its members, their
intelligence, their exceedingly simple and primitive
government, and their want of understanding of the
white man's laws relating to real property.   It seems
altogether probable that but little thought was given
to the descent of lands to collateral heirs, and that a
determination that, where there were no members of
the immediate family of the owner surviving him, the
land should go to the nearest of kin, would be about
as far as the matter would probably be considered.
The announcement testified to as having been made
by Captain Parks after the session of the council at
Chillicothe seems altogether probable and reasonable.
The same idea appears in the resolution of 1868, and
in the testimony of the witnesses when undertaking
to state the general rule.

The governmental system of the Shawnee tribe was
very simple.   Two chiefs and five council-
4. Government-
al system of men possessed the executive, legislative
the tribe.
and judicial power of the tribe.   The chiefs
presided at the council meeting, and were the execu-
tive heads of the tribe.   In the passage of a law the
concurrence of the council and chiefs was required.
In determining the law of the tribe in 1862, it must
be apparent that no safe guide is afforded us.   There
is no written law enacted before that time to be in-
terpreted, nor, of course, could so simple a community
have records of judicial expositions of their customs
which could afford us much light.   We find nothing

in all the testimony on which we can safely rest. It must be apparent that no custom governing any considerable number of cases of descent of lands could possibly have been established in a little community of a few hundred simple Indians in the brief period of five years. The witnesses evidently had no knowledge of usages and customs, where there were no instances in which usages could have been established. We are in no better position to find a custom than were the witnesses. It must be evident that we can do little more, if we rest our conclusion on the testimony, than conjecture what the rule was, and make that conjecture in the light of a reasonable certainty that there was in fact no custom and no established rule beyond, perhaps, the very general one declared at the Chillicothe meeting, that the property should go to the next or nearest of kin.

In determining who is an heir of a deceased person it is not only necessary to know what the law is, but it is also necessary to know the relationship of the parties.

The evidence shows that the Shawnee laws of marriage and divorce were very lax. All that was necessary to constitute a marriage was that the parties should live together by agreement as man and wife. All that was necessary to constitute a valid divorce was that they should separate. After such separation, either party was at full liberty to contract another marriage, and these marriages and divorces might go on without limit. Children born of the parties were regarded as legitimate, and the woman with whom a man lived as his wife at the time of his death was regarded as his widow, and entitled to inherit a share of his property. In one particular, at least, the Shawnee law of descent was

5. Laws of marriage and divorce.

always different from that of Kansas, for only a member of the Shawnee tribe could inherit.    Article 9, of the treaty of May 10, 1854, is as follows :  ''Congress may hereafter provide for the issuing to such of the Shawnees as may make selections patents for the same, with such guards and restrictions, as may seem advisable for their protection therein.''    And by the act of March 3, 1859, (11 U. S. Stat. at Large, 431,) it is provided that patents may issue to such Indians and their heirs upon such conditions and limitations, and under such guards or restrictions as may be prescribed by the secretary of the interior.    Ko-to-wah-cum-se, according to her own testimony, was about 30 years old in May, 1889, when her deposition in this case was taken.    She would then have been only about three years old at the date of the death of James Blacksnake. While it is apparent from the testimony that the head men had a pretty general acquaintance among the members of the tribe, it would not have been an easy matter for a stranger to make an investigation into a question of heirship where the deceased Indian had no family of his own.    The rules prescribed by the secretary for the conveyance of lands patented under the treaty require that the chiefs certify to the identity of the persons executing the conveyance, and, where they claim to be heirs of a deceased reservee, that the chiefs should certify that the persons executing the conveyance were the only heirs.    It must be conceded that the secretary had no power to make any rule. governing the descent of property, or to make any person an heir who was not such under the Shawnee law.    But it appears from the testimony that the Indians did accept, recognize and act upon the rules promulgated by the secretary, and that the matter of certifying as to who were heirs of deceased Indians

was confided exclusively to the chiefs. The council did not undertake to control them in the discharge of this duty, and there is testimony that the chiefs had power to decide who the heirs were to lands of a deceased Indian. In this particular case, the chiefs certified that William Williams was the sole heir of James Blacksnake, the patentee. If the Shawnee law was that the property descended to the nearest of kin, this certificate was correct, for William Williams was one degree nearer to James Blacksnake than Ko-to-wah-cum-se, and Pish-a-qua-pe-a-se was not of his blood at all. Ko-to-wah-cum-se was but a little child. Charles Bluejacket, one of the chiefs, who certified to the deed under which the defendants claim, testified that when he signed this certificate he believed that William Williams was the only heir of James Blacksnake, but that he did not know that Robert Williams left a widow and child living; that he "did not know who his wife was exactly because they had moved to the Black Bob settlement and he picked up a wife — a woman there, and married and lived with her." He did not know whether they had any children or not. Blackhoof, the other chief, was dead at the time this deposition was taken.

The deed to Gabbart and Baldwin remained unchallenged for 25 years, until the plaintiff sought to buy up the interest in the lands of those under whom he claims. During that time the city of Argentine grew up ; railroads were constructed across the lands, and they became very valuable. We are asked to hold that the statute of limitations applies, and that the plaintiff's cause of action is barred by lapse of time. If these were really Indian lands, they were governed by the Shawnee law and not by that of Kansas, and our statute of

6. Statute of limitations does not apply.

limitations cannot be invoked.   But the fact that the defendants' title has remained unchallenged for a quarter of a century is a matter worthy of some consideration, and entitled to some weight in determining a disputed question of right.   That an Indian may be guilty of laches in failing to assert his rights, see *Felix v. Patrick*, 145 U. S. 317.   After the lapse of so long a period of time, we think that very great weight should be given to the certificates of the chiefs as to the law and the fact of heirship, and that where there is no claim of fraud, and where the proof in reference to what the law was is so vague and indefinite as it is in this case, the determination of the chiefs, made at the time and when the opportunities for determining both the law and the fact were so much better than are now afforded us, ought to have controlling weight in the decision of the case.   Of course, in case of fraud like that of *Richardville v. Thorp*, 28 Fed. Rep. 52, relief might be afforded the defrauded heirs.   But in this case there is nothing to indicate that the chiefs acted with anything but good faith, nor is there any proof that Gabbart and Baldwin knew at the time they bought the land that Blacksnake had any heir other than William Williams.

We do not deem it necessary to comment at length on the proceedings of the Shawnee chiefs and council had after this action was commenced.   Nor can it be claimed that the investigation made under the direction of the department of the interior for its own information, and to govern the action of the secretary with reference to approving the deed to the plaintiff, has any binding force upon us.   The case must be decided under all of the testimony, and the important question to determine is, Who were the heirs of James Blacksnake under the Shawnee law as it stood

in 1862? We think it safest to adhere to the determination made and certified to by the chiefs at that time, and must hold that William Williams was the sole heir, and entitled to the whole of the land in controversy.

The judgment of the district court is affirmed.

All the Justices concurring.