Dunbar v. Green.

R. R. DUNBAR *et al.* v. SANFORD M. GREEN *et al.*
.No. 13,005.  (72 Pac. 243.)

SYLLABUS BY THE COURT.

1. ESTOPPEL—*Laches Imputed to an Indian.*  The fact that a litigant is a member of an Indian tribe does not release him from all obligation to be diligent in asserting his rights.  While it is one of the matters to be considered with the other circumstances of a case in determining the effect of delay, it is not a complete bar to the defense of laches.

2. —————— *Shawnee Indian Held Estopped.*  Where the land of a Shawnee Indian is sold while he is a minor, by a guardian appointed by a probate court, and the Indian, after coming of age, delays for more than twenty-one years to question the validity of the deed, and the property has in the meantime greatly increased in value and passed into the hands of different owners, no fraud or concealment or other exceptional circumstances tending to excuse the delay being shown, he cannot afterward be permitted to attack the deed on the ground that the proceedings upon which it was based were void for want of jurisdiction.

66   557
66   794

66   557
f68   831

66   557
f69   852
69   872

66   557
81   640

Error from Wyandotte district court; E. L. FISCHER, judge. Opinion filed April 11, 1903. Affirmed.

_Bird & Pope_, for plaintiffs in error.

The opinion of the court was delivered by

MASON, J.: This proceeding originates in a controversy over the title to thirty-two lots, forming parts of eight blocks, in Argentine Heights, an addition to the city of Argentine, in Wyandotte county. The northwest quarter of section 29, in township 11, of range 25 (in which quarter-section such lots are located), was patented by the United States on December 28, 1859, to Susan Whitefeather, as a member of the Shawnee Indian tribe, under the provisions of the treaty of May 10, 1854. She died some time prior to July 10, 1862, and her son, George Washington, inherited such land. He remained a member of the tribe until September 26, 1900, when he was made a citizen of the United States. On November 27, 1867, he being then over fourteen years of age, the probate court of Johnson county appointed Jonathan Gore as his guardian. Gore, as such guardian, under authority of such court, sold said quarter-section of land (with an additional tract of forty acres) to Joel F. Kinney for $2000, executing to him a guardian's deed, which was approved by the secretary of the interior May 21, 1869. The title so acquired by Kinney to the property here involved has passed by a series of conveyances to the Greens, defendants in error. George Washington (who may be considered as the sole plaintiff in error, he alone claiming title) took no step to challenge the validity of the guardian's deed until June 25, 1895, when, according to the agreed statement of facts upon which the case was submitted

to the district court, R. R. Dunbar, another plaintiff
in error, took possession of the land as his agent.
The Greens brought an ejectment action.   The In-
dian claimant answered, asserting title in himself, and
asked for a decree against plaintiffs quieting his title.
The district court decided in favor of plaintiffs.   Plain-
tiffs in error ask to have the judgment reversed upon
the ground that the guardian's deed was void for the
reason (among others) that, the real estate being
owned by a Shawnee Indian deriving title by descent
from the original patentee, the probate court had no
jurisdiction to appoint a guardian or to order its sale.
They further contend that so long as George Wash-
ington retained his character as a tribal Indian no
statute of limitations ran against him ; that he could
not be estopped by his conduct, and no laches could be
imputed to him.   No brief has been presented or ar-
gument made in this court in behalf of defendants in
error.

We shall assume for the purposes of this case that
the guardian's deed was void for want of jurisdiction.
It is not claimed that it was tainted by any fraud or
that it was in contravention of any statute.   It seems
to be virtually conceded that in the case of an ordi-
nary litigant inaction for so long a time would consti-
tute an effective bar to the assertion of a claim to the
land, regardless of any statute of limitation.   It will
be noted that George Washington must have reached
the age of twenty-one years before November 27, 1874.
There was therefore an interval of more than twenty-
one years after he attained his majority within which
he did nothing to assert his title or to challenge the
sufficiency of the guardian's deed.   In the meantime
we know without evidence that the property must
have increased greatly in value, and the record shows

that it has been platted into city lots and sold in small parcels to different persons. The serious question for consideration then is whether a member of an Indian tribe may suffer a loss of property rights through laches, and, if so, to what extent his character as such affects the rule as applied in other cases.

At page 217 of volume 16 of the American and English Encyclopedia of Law (2d ed.), under the title "Indians," and also at page 108 of volume 18 of the same work, under the title "Laches," it is stated as a general proposition that laches cannot be imputed to a tribal Indian. However, only two cases are cited in support of the statement. They are *Laughton v. Nadeau*, 75 Fed. (C. C.), 789, and *Felix v. Patrick*, 145 U. S. 317, 12 Sup. Ct. 862, 36 L. Ed. 719. In the very extensive brief filed by plaintiffs in error the only cases cited upon this specific proposition are the two just noted and *Sheldon v. Donohoe*, 40 Kan. 346, 19 Pac. 901. The Kansas case is not in point. There a Chippewa Indian held title to a tract acquired under a treaty providing that the land could not be sold or otherwise disposed of, except to the United States or to the members of the tribe. While this treaty provision was still in force the Indian owner deeded the tract to a white man, who took possession and held it for sixteen years. The decision was that, since the paramount federal law prohibited the grantee from taking title, he could not indirectly build up one by adverse possession, estoppel, or any statute of limitations. The question of the degree of accountability for his conduct to which an Indian is subject was not involved and was not discussed.

The case of *Laughton v. Nadeau* (decided in 1896 by Judge Foster), however, tends to support the contention of plaintiffs in error. There a conveyance was made

Dunbar v. Green.

without the approval of the secretary of the interior, the case being one where such approval was necessary to the passing of the title. The Indian owner was permitted to set aside the conveyance. In the opinion it was said : "No laches could be imputed to complainant while under disability as a tribal Indian. He and his land were under the control of the government." This is all that was said upon the question of laches. It will be noted that the second sentence quoted seems to modify, or, at all events, give the reason for, the first. The phrase "disability as a tribal Indian" may be interpreted as having reference to the specific disability under the treaty to alienate the land, rather than to a general disability resulting from the mere fact of membership of an Indian tribe. However, we shall consider the authority of this case as against the decision of the trial court. From what has just been said, it is obvious that the language quoted was used almost incidentally, the principal discussion being confined to other questions. It appears to have been based upon two decisions which the court had already cited in another connection. They are *Wiggan v. Conolly*, 163 U. S. 56, 16 Sup. Ct. 914, 51 L. Ed. 59, and *Eells v. Ross*, 12 C. C. A. 205, 64 Fed. 417. These cases merely affirm the power of the government of the United States by consent of the Indian tribe to impose valid restrictions upon the alienation of lands patented to individual Indians, and throw no light upon the matter of laches, unless it may be through references in general terms to such individuals' being, for the purposes there involved, under the charge and care of the nation and tribe.

The case of *Felix v. Patrick*, supra, we construe as an authority against the contention of plaintiffs in

36—66 KAN.

error that a tribal Indian cannot be guilty of laches. It is a review of *Felix v. Patrick*, 36 Fed. (C. C.) 457, decided in 1895 by Judge Brewer, Judge Dundy participating in the hearing. The suit involved a tract of land within the city of Omaha. The title of the occupants was based in the first instance upon a fraud perpetrated on an Indian, whose heirs sought, in effect, to recover the land by having the title originally taken by fraud, and all titles derived through it, impressed with a trust for their benefit. A demurrer to the complaint was sustained. The opinion, after stating that the two principal grounds of demurrer were as to the effect of a certain act of congress and the staleness of plaintiffs' claim, and after discussing such statutory question, proceeded as follows :

"But in such cases equity will recognize the defense of laches and staleness of claim, under proper circumstances, and this is a case where it seems eminently proper to recognize and enforce such a defense. Under ordinary circumstances it does not seem probable that any one would seriously contend that a claim so stale could be enforced, or that equity would take property which had increased so enormously in value after this lapse of time and give it to parties who had done nothing towards such enhancement of value. But it is earnestly contended that a different rule should be applied in this case, because plaintiffs and their ancestors were Indians; that the law is very tender in respect to the rights of such persons, who are not familiar with our laws and methods of transacting governmental or private business, and were ignorant of the disposition which had been made of the scrip. And it is also urged that as Indians they were the wards of the government, and could not have asserted their rights to the property even if they had known what their rights were. It is not shown that they were not persons of education and

intelligence, or that they were not in fact familiar
with the land laws and the methods of governmental
business, or that they were not in fact as competent
to look after their rights as any persons.  We all know
that many of these Indians, especially half-breeds,
are well educated, intelligent, and as fully competent
to look after their business affairs as any persons ; and
the fact that they were Indians, and maintaining
tribal relations, and were in a certain sense the wards
of the government, did not debar them from a hear-
ing in the courts of Nebraska. . . .  At any time
during the last twenty-seven years these plaintiffs or
their ancestors could have come into the courts of
Nebraska and asserted their rights, and, as this scrip
was of value simply for the entering of lands, they
could at any time, by examining the records at Wash-
ington, have ascertained whether it had been used
and by whom, and where the land for which it had
been used was located.  The means of knowledge
were open before them.  They had the right to sue,
and the courts would have given them full protection.
It would savor little of equity to permit them to come
in now and take from these many defendants, most
of whom are innocent of any intentional wrong, prop-
erty of such enormous value, on the ground that their
ancestor twenty-eight years ago was swindled out of
scrip of such trifling value—a million dollars to-day
for one hundred and fifty dollars twenty-eight years
ago.  I cannot believe that equity demands or even
tolerates this.  The demurrer will be sustained.''

Upon the appeal the supreme court affirmed the
decree of the circuit court.  The opinion, after stating
that there were really but two questions involved in
the case, one being whether plaintiffs were estopped
by laches, and after discussing the other question,
proceeded as follows :

''The most important question in this case, how-
ever, the question upon which its result must ulti-
mately depend, is that of laches. . .  It admits
of no doubt that if Sophia Felix and these plaintiffs

had been ordinary white citizens, under no legal disabilities, such as those arising from infancy, lunacy, or coverture, this lapse of time would be fatal to a recovery; at least, unless it were conclusively shown that knowledge of the fraud was not obtained, and could not by reasonable diligence have been discovered, within a reasonable time after it was perpetrated. In reply to this defense of laches, plaintiffs rely mainly upon the fact that Sophia Felix and her heirs were at the time, and continued to be until 1887, tribal Indians, members of the Sioux nation, residing upon their reservation in the state of Minnesota, and incapable of suing in any of the courts of the United States. We are by no means insensible to the force of this suggestion. Whatever may have been the injustice visited upon this unfortunate race of people by their white neighbors, this court has repeatedly held them to be the wards of the Nation, entitled to a special protection in its courts and as persons 'in a state of pupilage.' Congress, too, has recognized their dependent condition and their hopeless inability to withstand the wiles or cope with the power of the superior race, by imposing restrictions upon their power to alienate lands assigned to them in severalty, either by making their scrip non-assignable, as in this case, or by requiring the assent of the president to their execution of deeds as in the case of *Pickering v. Lomax*, ante, 310, decided at this term. We fully coincide with what was said by Mr. Justice Davis in the case of *The Kansas Indians*, 5 Wall. 737, 758, that 'the conduct of Indians is not to be measured by the same standard which we apply to the conduct of other people.' But their very analogy to persons under guardianship suggests a limitation to their pupilage, since the utmost term of disability of an infant is but twenty-one years, and it is very rare that the relations of guardian and ward under any circumstances, even those of lunacy, are maintained for a longer period than this. It is practically admitted in this case, that, in 1887, when their relations with their tribe were severed by accepting allotments of land in severalty under the treaty of 1878, they become citizens of the

United States; that they were then chargeable with the same diligence as white people in the discovery of this fraud; and, as their bill was filed in 1888, it was claimed that they fulfilled all the requirements of law in this particular.   While, as alleged in the bill, their discovery of this fraud may have been contemporaneous with their becoming citizens of the United States, there is no palpable connection between the one fact and the other, and we think the bill is defective in failing to show how the fraud came to be discovered, and why it was not discovered before.   A simple letter to the land department at any time after this scrip was located would have enabled them to identify the land, and the name of the person who had located it; and it is difficult to see why, if they had ever suspected the misuse of this scrip, they had not made inquiries long before they did, or why their emancipation in 1887 should have suddenly awakened their diligence in this particular.   .   .   .   Sophia Felix and her husband must have known that she had parted with the scrip, yet she lived until 1865, and her husband until 1882, without apparently making any attempt to discover what had become of it.   Nor did their heirs apparently make any effort to discover it until 1887, when their intelligence seems to have suddenly sprung into activity upon their becoming citizens of the United States.   It is scarcely necessary to say in this connection, that while until this time they were not citizens of the United States, capable of suing as such in the federal courts, the courts of Nebraska were open to them as they are to all persons irrespective of race or color.   .   .   .   The mere fact that in 1887 these plaintiffs took their land in severalty and became citizens does not adequately explain how they so quickly became cognizant of this fraud, or why they had remained so long in ignorance of it.''

The opinion then presents a further argument to the effect that, even conceding that the complainants were incapable of being affected with laches, it would not necessarily follow that they should have the relief

demanded, but that equity would be satisfied with a repayment of the value of the scrip, the fraudulent procuring of which was the foundation of defendant's title. It concludes with a reference to the disastrous consequences that would attend the unsettlement of large numbers of titles "upon which the owners have rested in assured security for nearly a generation."

We quote thus extensively from this opinion in an effort to present practically all of it that directly affects the subject under consideration, in view of the fact that it has been cited as supporting the view that laches cannot be attributed to a tribal Indian. In the brief of appellants in the federal supreme court the followir ~ cases, and no others, were cited upon this quest⅋ . *The Cherokee Nation v. The State of Georgia*, 5, et. 1, 17, 8 L. Ed. 25; *Fellows v. Blacksmith et a' ,* 19 How. 366, 15 L. Ed. 684; *Kansas Indians*, 5 Wall. 737, 18 L. Ed. 667; *New York Indians*, 5 Wall. 761, 18 L. Ed. 708; *Ex parte Crow Dog*, 109 U. S. 556, 568, 3 Sup. Ct. 396, 27 L. Ed. 1030; *Elk v. Wilkins*, 112 id. 94, 111, 5 Sup. Ct. 41, 28 L. Ed. 643; *United States v. Kagama*, 118 id. 375, 383, 6 Sup. Ct. 1109, 30 L. Ed. 228; *Choctaw Nation v. United States*, 119 id. 1, 7 Sup. Ct. 75, 30 L. Ed. 306. These cases have only the most remote application, and were doubtless invoked, in the absence of more direct authority, because they abound in expressions to the effect that Indians are the wards of the Nation and are entitled to protection at the hands of the federal government. We conclude that the weight of judicial opinion is against the rule announced in *Laughton v. Nadeau*, above cited. See, also, in this connection *Rubideaux v. Vallie*, 12 Kan. 28; *Hannon v. Taylor*, 57 id. 1, 45 Pac. 51; *Schrimpcher v. Stockton*, 58 id. 758, 51 Pac. 276, s. c. 183 U. S. 290, 22

Sup. Ct. 107, 46 L. Ed. 203 ; *Swartzel and others v. Rogers*, 3 Kan. 374.

We also approve, on principle, the doctrine that the fact that a litigant is a tribal Indian is not a complete bar to the defense of laches, although it is to be taken into account in determining the effect of his inaction. Whenever this defense is invoked there must be a consideration of all the special circumstances of the case. The mere extent of the delay is one item to be considered.   Among others are, any change of conditions, the intervention of the rights of third parties, the likelihood of other interests being affected by the delay, the presence of fraud and its character, the diligence required to discover it, and so on.   The partial disability of a litigant, resulting from his membership in an Indian tribe, is merely one factor, to be considered with all the other features of the case, and given the weight to which it may be entitled, in reaching a conclusion consonant with the general rule. His being an Indian entitles him to more liberal treatment in the matter just so far as it is an indication of his inferior capacity.   To hold this guarantees him the exact amount of special protection to which he is fairly entitled.   To go further, and hold that it gives him absolute immunity from the consequences of his own neglect, would be to make it a means of injustice toward others, rather than of protection to himself.

Taking this view of the case, we find no difficulty in affirming the judgment of the trial court.   Apart from the mere fact of the claimant's being an Indian there is nothing to excuse the delay in this case.   The land was sold for a price that two Shawnee chiefs and an Indian agent certified to be fair ; the secretary of the interior approved the sale ; the owner received and retained certainly a part, and presumably the

whole, of the purchase-money; no fraud of any character is charged; there was no concealment. While the property directly involved in this litigation may not be very valuable, the determination of this case necessarily affects the title to 200 acres of land now lying close to a great city and probably owned by many different individuals. Perhaps the consideration last stated is not one proper to be weighed at this time and in this proceeding, but it is one that need not be taken into account to reach a just decision. We conclude that, notwithstanding plaintiff was a Shawnee Indian, his inaction for twenty-one years under such circumstances was sufficient to preclude him from thereafter asserting a title to this land.

The judgment is affirmed.

All the Justices concurring.