CAMP MANUFACTURING COMPANY V. GREEN, ET ALS.

March 17, 1921.

Absent, Sims and Burks, JJ.

1. LACHES—*Partition Suit—General Rule.*—The general rule is that the doctrine of laches does not apply to a suit for the partition of land brought by the holder of the legal title within the statutory period, where there has been no title acquired by adverse possession by the defendant or his predecessors in title.

2. LACHES—*Partition—Cloud on Title—Case at Bar.*—Where complainants by their bill show that their suit was not a mere suit for partition, in which the rights of the parties are clear, but the bill itself shows adverse claims under deeds running through a period of over fifty years, alleging that these conveyances constitute a cloud upon the title of complainants, and prays that the rights of all the parties may be adjudicated, the rule that laches does not apply in a suit for partition is not applicable. As complainants are seeking relief which only a court of equity could give, that is, the removal of an alleged cloud upon their title, equitable doctrines should control the disposition of the case.

3. LACHES—*Reason for the Doctrine.*—The underlying reason for the doctrine of laches is that because of the lapse of time, and the death of parties, it is impossible to ascertain all the facts, and therefore it is just to leave the parties in the position in which they have placed themselves.

4. EVIDENCE—*Lapse of Time—Presumption of Integrity.*—In a proceeding to have a deed declared void as a cloud upon complainant's title, the fact that all the parties interested in the property at the time the original void conveyance was made are dead, makes it necessary to consider every circumstance from which any inference might fairly be drawn. Conduct which would have required explanation from those responsible for and familiar with the transactions under criticism will be construed so as to impute intelligence, honesty, and integrity to the actors who cannot now speak, rather than ignorance, fraud, chicanery, and intention to do wrong. Thus, where all the parties to a long past family settlement are dead, they are presumed to have known their rights.

Syllabus.

5. EVIDENCE—*Presumption—Acquiescence—Estoppel.*—An executor, a son-in-law of testator, without authority, sold and conveyed testator's realty. For over fifty years, until the present suit was instituted, there was no claim of title by complainants, descendants of the wife of the executor, a devisee, their parents or their grandparents under whom they claimed, to the property thus wrongfully conveyed by the executor.

· *Held:* From this and other circumstances it might fairly be inferred that complainants' ancestress, wife of the executor, had notice of and acquiesced in the transaction.

6. DOCUMENTARY EVIDENCE—*Accounts of Executors—For What Purpose Admissible—Illegal Sale of Land by Representative.* —While it is true that *ex parte* accounts of executors and administrators are not evidence of overpayments by them, or that the claims stated in such accounts were debts justly due by the deceased and chargeable upon his real assets, it is proper in a suit to set aside an unauthorized deed to real property by an executor, as a cloud upon title, to consider the fact that the accounts of the executor indicated that the personal estate was insufficient to pay the debts of the testator, not for the purpose of establishing these debts against the estate, but in order to show that the fact thus indicated was called to the attention of the devisees, and supplied a motive for their acquiescence in the illegal sale of their property.

7. DOCUMENTARY EVIDENCE—*Accounts of Eexecutors—For what Purposes Admissible—Illegal Sale of Land by Representative.*— The accounts of an executor who has made an illegal sale of his testator's real estate, can be adverted to for the purpose of showing that the executor himself admitted his own liability to the devisees of the land for a certain balance from the sale, and, in the absence of contrary proof, there must be a presumption after a lapse of over fifty years which would be enforced in every forum, either that this balance had been paid to the parties entitled.thereto, or that they had waived their right to collect it.

8. DECLARATIONS AND ADMISSIONS—*Admission Against Interest— When Admissible.*—The admission of a party in interest against his own interest, however and whenever such admission may be made, can always be introduced when it affects either his own claim or that of those claiming under him.

9. DECLARATIONS AND ADMISSIONS—*Admission Against Interest— When Admissible—Case at Bar.*—Thus, in a suit to declare an unauthorized deed made by an executor of the real property of his testator void as cloud upon title, the admission of the father of three of the complainants and the husband of another that his mother, one of the devisees, had received her

46

share of the purchase money of the property was binding on complainants.

10. LACHES—*Executor's Deed of Land—Case. at Bar.*—In the instant case an executor, son-in-law of the testator, without authority, sold and conveyed testator's real estate. After more than fifty years the heirs of the executor's wife, a devisee, instituted a suit to have the executor's deed declared void as a cloud on their title.

*Held:* The complainants were barred by reason of the lapse of time, and consequent loss of evidence from which the court might ascertain the truth as to acquiescence and ratification.

11. LACHES—*Title to Real Property.*—Mere lapse of time or inaction on the part of the owner of real estate by clear record title, where there is no adverse possession, will not defeat such title, but unexplained and unreasonable delay, the existence of adverse claims of title, and of facts and circumstances fairly brought home to the knowledge of the owner of the legal title, and the failure to act for the protection of such legal title for such a length of time as to destroy all of the evidence of the original transaction out of which such adverse claim arises, will and ought to bar such relief, for the sound reason that he who fails to speak when he ought to will not be heard if he attempts to speak after the rights and equities of others have supervened, when he ought to be silent.

12. LACHES—*Pleading—Negativing Laches.*—A party who seeks the aid of a court of equity, after long delay in the assertion of a claim, should set forth in his bill specifically what were the impediments to an earlier prosecution of his claim, how he came to be so long ignorant of his rights, and the means, if any used by the defendant to fraudulently keep him in ignorance, and how and when he first came to a knowledge of the matters alleged in his bill; otherwise the chancellor may justly refuse to consider the case, on his own showing, without inquiring whether there is a demurrer,. or formal plea of the statute of limitations contained in the answer.

13. LACHES—*Pleading—Negativing Laches—Case at Bar.*—In the instant case the bill itself recited a chain of conveyances running through half a century, showing that defendant and its predecessors had claimed thereunder, but did not allege either ignorance of their rights or any other matter constituting any impediment whatever to an earlier prosecution of their suit by complainants, and there were both answer and demurrer setting up the defense of laches.

*Held:* Under this state of the pleading, the court might have justly refused to consider complainant's case.

14. EXECUTORS AND ADMINISTRATORS—*Illegal Deed of Executor—
Estoppel of Executor's Heir.*—An executor, a son-in-law of
testator, made an unauthorized deed of testator's real prop-
erty. In a suit to have this deed set aside as a cloud upon the
title, complainants were the children or grandchildren of the
executor and his wife, a devisee, or claimed under such chil-
dren. According to the executor's accounts, he received the
entire proceeds arising from the sale of the land. If he did
not account therefor, then his heirs at law and distributees
or those claiming under them, received the proceeds of the sale
by so much as the executor's estate was thereby augmented.

    *Held:* Upon equitable principles, before complainants could suc-
cessfully assert title to the property conveyed, they must ac-
count for the proceeds of its sale which their ancestor received.

15. LACHES—*Acquiescence—Ratification—Estoppel—Case at Bar.*—
While it is true, as a general rule, that the mere silence of the
owner will not defeat a good record title to real estate, the
unequivocal declaration of the husband of one of complainants
and the father of three other complainants, in the instant case,
that his mother received her share of the proceeds of the sale
attacked, is the antithesis of mere silence on his part, and if
the statement be true, such action on his mother's part, under
whom all complainants claim, is not mere silence, but express
ratification, which is conclusive against all who claim under
her, and in the instant case the truth of the son's statement
is also fairly inferable from the mother's conduct.

Appeal from a decree of the Circuit Court of Brunswick
county. Decree for complainant. Defendant appeals.

*Reversed.*

The opinion states the case.

*E. P. Buford,* for the appellant.

*E. R. F. Wells, B. A. Lewis* and *Plummer & Bohannan,*
for the appellees.

PRENTIS, J., delivered the opinion of the court.

The material facts out of which this controversy arises
are these: Miles B. Branch died, in 1861, seized of a tract

of 787 3-4 acres of land in Brunswick county. By his will, which was probated in October, 1861, he gave his wife one-third of his estate for life, and subject to this life estate he devised the land to his four daughters—Ann R. Green, Rosa M. Branch, Susan E. Branch and Mary E. Branch. George W. Green, who was the husband of his daughter, Ann R. Green, was named as executor and qualified. Besides his widow, he left surviving him nine children, five sons and the four daughters above named. After his death 266 3-4 acres of the land was assigned to his widow, and this left 521 acres devised in fee to the four daughters. Notwithstanding the fact that the executor had no authority under the will to sell the real estate, he, in 1863, sold this 521 acres at public auction; one of the sons, William J. Branch, became the purchaser, and the executor undertook to convey it to him by deed dated January 23, 1864. On October 24, 1878, this son, William J. Branch, executed a deed of trust thereon to secure certain of his own indebtedness, and thereafter he conveyed three parcels thereof, aggregating 150 acres, to Goodwyn Grain, Sallie Penn and Lewis Penn, severally; and it is conceded that they have acquired good titles thereto by adverse possession. On August 26, 1882, Leake and Donnan, trustees under the deed of trust, sold and conveyed the residue thereof, 371 acres, to the administrator of Carter R. Bishop. On July 24, 1889, Davis and Mann, special commissioners, acting under a decree of the Hustings Court of the city of Petersburg, sold this 371 acres at public auction to E. G. Temple and conveyed it to him. On September 15, 1889, Temple conveyed the same 371 acres to the Brunswick Lumber Company, and on November 1, 1902, the Brunswick Lumber Company conveyed it to the appellant, Camp Manufacturing Company. This 371 acres has been in a state of nature, covered with a growth of standing timber, since the death of Miles B. Branch, and has not been in actual possession of any of the parties.

The subject of this immediate controversy is only that share of the 371 acres which belonged to Ann R. Green, one-fourth of which she derived under the will of her father, Miles B. Branch, and one-thirty-second thereof by descent from one of her four sisters, Rosa M. Branch, who died in 1864, making a total of nine-thirty-seconds. George W. Green, the executor, lived until the year 1890, and his widow, the said Ann R. Green, survived him several years, but has been dead for many years. The accounts of the executor, of which he made two, show that he received $4,689 for the 521 acres so sold by him at public auction, and that a portion thereof was applied to the payment of the claim of Miles B. Branch, Jr., another son of the testator, the personal property for which he accounted being insufficient for that purpose. The purchaser, William J. Branch, died in 1910, more than eighty years old.

Ann R. Green and George W. Green left seven surviving children as their heirs at law. The complainants here are their son, Joseph B. Green; their daughter, Freddie Britton, and the widow and three children of their son, Sidney M. Green, so that J. B. Green and Freddie Britton claim directly as heirs at law of their mother, Ann R. Green and the other complainants as heirs at law of her son, their father, Sidney M. Green, deceased.

Prior to this litigation (in 1909), the claimant of the undivided interests in the land which had been devised by the will to Susan E. Branch (who became Mrs. Dunn), and to Mary E. Branch (who became Mrs. Rae), instituted an action of ejectment and recovered 18-32 of the entire tract. The history of that litigation is found in *Seward* v. *Camp Mfg. Co.*, 112 Va. 479, 71 S. E. 614. After this recovery the Camp Manufacturing Company instituted its suit in equity to enjoin the enforcement of that judgment upon the ground that the original devisees, Mrs. Rae and Mrs. Dunn, were estopped by laches, and that their grantee, Seward,

who had recovered in the action of ejectment, was likewise estopped.  In that suit, both Mrs. Rae and Mrs. Dunn testified that they had never received any part of the purchase money.  The trial court refused the injunction, and this court refused an appeal November 9, 1911.  More than four years thereafter, in January, 1916, the complainants instituted this suit, claiming their proportions of the nine-thirty-seconds of the land as children and grandchildren and as successors in title to Ann R. Green.  The bill recites the various conveyances under which the appellant claims title and alleges that these conveyances constitute clouds upon the title of the complainants and of the other lawful owners thereof as successors in title to Ann R. Green, and so prevents the free alienation of their interests, and prays that in the event partition in kind cannot be made, that the land may be sold and the proceeds divided among those interested therein in accordance with their respective rights and equities, that the rights of all parties to this suit in and to the said land may be adjudged, and for general relief.

The appellant, as one of the defendants, filed its demurrer and answer to this bill, which demurrer the trial court overruled, and having first established the title of the appellees to the interest in the land which they claimed, referred the cause to a commissioner to ascertain what damage, if any, they had suffered by reason of timber cut and removed from the premises by the appellant; and it is of these decrees that the appellant complains.

The case has been elaborately and ably argued, and this reduces and simplifies our own labor.  The appellant here is not relying upon mere silence to bar the assertion of a title to land, originally good, but now alleged to be stale and antiquated, nor does it rely merely upon the doctrine of equitable estoppel by conduct to bar the assertion of the legal title.  To use the language of the appellant's

learned counsel, it relies upon "the defenses of laches and equitable estoppel upon the grounds: (1) That this suit was not brought until fifty-two years had elapsed after the execution of the deed by George W. Green, executor, which is now assailed; (2) that all the parties to the original transaction have long been dead, and evidence to prove the original facts and circumstances is no longer available; (3) that the suit was not brought by parties whose rights were affected by the executor's sale, but by members of the second and third generations; (4) that the ancestors of the plaintiffs evidently abandoned all claim to the legal title to the land in controversy; and (5) that the ancestors of the plaintiffs received the benefit of the whole of the proceeds of the sale."

[1, 2]   For the appellee it is contended that there is no evidence to sustain these propositions, and that the appellant's case rests entirely on allegations, assertions and assumptions unsupported by sustaining evidence. It is claimed, and this must be conceded, that the general rule is that the doctrine of laches does not apply to a suit for the partition of land brought by the holder of the legal title within the statutory period where there has been no title acquired by adverse possession by the defendant or his predecessors in title. It is said in *Cole's Adm'r* v. *Ballard*, 78 Va. 149, that "no principle is better established, or more uniformly acted on in courts of equity, than that, in respect to the statute of limitations, equity follows the law—that is to say, if a legal demand be asserted in equity, which at law is barred by statute, it is equally barred in a court of equity; and if not barred by statute law, neither is it barred in equity;" and relying upon this doctrine, the claim is made that because the deed from George W. Green, executor, is void and there has been no adverse possession of the property, the legal title of the complainants is perfect, and the defense of laches cannot be invoked to defeat

such a title.   In this case, however, the complainants them-
selves show by their bill that this is not a mere suit for
partition, in which the rights of the parties are clear, but
the bill itself shows adverse claims under deeds running
through a period of over fifty years, alleges that these con-
veyances constitute a cloud upon the title, and prays that
the rights of all of the parties may be adjudicated.   This
we think sufficient to take the case out of the general rule
just alluded to.   There is no other controversy in this case,
except that which arises out of these deeds and the adverse
claims thereunder.   The complainants have sought the re-
lief which only a court of equity could give—that is, the
removal of the alleged cloud upon their title created only
by these conveyances and the consequential adverse claims
thereunder.   Hence, equitable doctrines should control the
disposition of the case.

[3]   The underlying reason for the doctrine of laches
is that because of the lapse of time and the death of par-
ties, it is impossible to ascertain all the facts, and therefore
it is just to leave the parties in the position in which they
have placed themselves.

In the case of *Akins* v. *Hill,* 7 Ga. 577, it is cited: "Equity
will not aid in the enforcement of stale demands.   Although
statutes of limitations are obligatory in equity as well as at
law, yet there are cases where that court will make time a
bar, although not strictly pleadable as a limitation.   * * *
The peace of society requires that there should be limits
put to litigation.   The justice and sense of civilized com-
munities have ever favored limitation laws.   There is no
principle of equity sounder, more conservative and more
prolific in all the fruits of peace than this: that he who
slumbers over his rights, with no impediment to his assert-
ing them, until the evidence upon which a counter-claim is
founded, may, from lapse of time, be presumed to be lost;
until the generation cognizant of the transactions between

the parties has passed away, and until original actors are in their graves, and their affairs left to representatives— the law, in the exercise of an equitable sovereignty, presumes it to be unjust that under such circumstances a complainant should be heard; and in nine cases out of ten it is unjust in fact, as well as in theory. It is presumed, and the presumption grows out of the principles of human nature, developed in universal experience, that men will use reasonable diligence to get what rightfully belongs to them."

[4] The fact that all of those interested in the property at the time the original void conveyance was made, all of the actors in the transactions out of which this controversy arises, have died, makes it necessary, in order to do justice, to consider every circumstance from which any inference may be fairly drawn. Conduct which would have required explanation from those responsible for and familiar with the transactions under criticism will be construed so as to impute intelligence, honesty and integrity to the actors who cannot now speak, rather than ignorance, fraud, chicanery and intention to do wrong. The executor, who was the husband of Ann R. Green, and who sold her property, is dead; the purchaser, her brother, who paid for the land which he had bought at public auction, is dead, and another of her brothers who received a part of the proceeds of sale, claiming to be a creditor of their father, the testator, is dead. Thus all of those who were then interested in the property and must, therefore, be presumed to have known their rights, are dead; so that we can only speculate as to the truth from the meager facts developed as to this long past family settlement made by these four thus bound by ties of affection and interest each to all the others.

[5] The time itself is most impressive—that is, the fact that for fifty-two years, until this suit was instituted, there was no claim of title by these appellees, their parents and their grandparents under whom they claim. What other

inference can be fairly drawn from these circumstances than that Ann R. Green herself acquiesced in these transactions? Her husband was the executor, her mother lived upon that adjacent portion of the original tract of land which had been assigned to her for life, two of these sales were at public auction, and 150 acres of the original tract has been occupied by claimants under deeds equally invalid as those under which the appellant claims. It taxes human credulity too much to assume, because notice is not specifically proved, that Ann R. Green had no notice of these transactions.

[6, 7]   While it is true under the doctrine of *Leavell* v. *Smith's Ex'rs*, 99 Va. 374, 38 S. E. 202, that the *ex parte* accounts of executors and administrators are not evidence of overpayments by them, or that the claims stated in such accounts were debts justly due by the deceased and chargeable upon his real assets, nevertheless, it is proper in this case that we should consider the facts that the accounts of the executor exist, that they indicate that the personal estate was insufficient to pay the debts of the testator, and if this was true that it would have been necessary to sell the real estate for the purpose of providing the funds for the payment of such debts. This, however, is not for the purpose of now establishing these debts against the estate of the heirs at law, for they have long since been barred, but in order to show that the fact thus indicated by the accounts was thereby called to the attention of the devisees, and therefore supplies the motive which may have guided them in acquiescing in the illegal sale of their property. Then again that account can be adverted to for the purpose of showing that the executor himself admitted his own liability to the owners of the land for the balance of $3,434.58 shown to be due by him on December 31, 1863. Certainly, in the absence of contrary proof there must be a presumption which would be enforced in every forum, either that

this balance has been paid to the parties entitled thereto, or that they have waived their right to collect it. It inevitably follows that if Ann R. Green, under whom the appellees claim title, has received her share of this balance arising from the proceeds of sale of her land, they are estopped from asserting title to the land itself.

[8, 9] As to the claim of the children of Sidney M. Green, there is still an additional circumstance to be considered—that is, that Sidney M. Green himself made an affidavit in the chancery suit of *Camp Manufacturing Company* v. *Seward,* in which that company was endeavoring to enjoin the judgment in the action of ejectment above referred to, which contains the statement that he was sure that his mother, Ann R. Green, had received her share of that purchase money. This statement is made in reply to a question which had no reference to Ann R. Green's interest, but only related to the interest of two of her sisters which was involved in that litigation, and as to one of these sisters he stated that she had received her share, while as to the other that she had not, and then he volunteered to say that he was sure that his mother had received her share, his impression, however, being based upon information received as a member of the family. While this deposition in its entirety may not be admissible as evidence in this case, it is certainly true that the admission of a party in interest against his own interest, however and whenever such admission may be made, can always be introduced when it affects either his own claim or that of those claiming under him. It is proper to observe in this connection that, although this statement was made in 1911, he, Sidney M. Green, the eldest son of Ann R. Green, the husband of one and the father of three of these complainants, lived until 1915, and this suit was not instituted until 1916. It may be regarded as absolutely certain that if Sidney M.

Green thereafter, in his lifetime, had brought suit asserting such a. claim of title as his widow and children here assert, this admission on his part would have defeated it.

[10]   It does not seem necessary to cite authority for our conclusion that these parties are barred from asserting the rights which originally existed by reason of the lapse of time, and consequent loss of evidence from which the court might ascertain the truth as to such acquiescence and ratification; but such authority is not lacking in cases resembling this.

In *Tracy* v. *Roberts*, 88 Me. 310, 34 Atl. 68, 51 Am. St. Rep. 394, it is held that the doctrine of equitable estoppel is legally available in an action at law as well as in equity. Hence, if a guardian has made a void sale of his ward's real estate, but in good faith, there being no fraud or mistake, and the ward has received the benefits of the proceeds of such sale, and has, by his conduct, ratified and affirmed it after he became of age, with full knowledge of the facts, the doctrine of equitable estoppel applies, and neither the ward nor those claiming under him, can afterwards recover the land itself. We do not mean by this citation to weaken the force of the rules generally applicable when the doctrine of equitable estoppel is invoked, for one of the essentials of that doctrine is that the party claiming the benefit of it has been deceived by the action of the party having the legal title to land, and where the facts are disclosed by the record itself, as in this case, the doctrine does not apply. *C. & O. Ry. Co.* v. *Walker*, 100 Va. 69, 40 S. E. 633, 914.

In *Dunbar* v. *Green*, 66 Kan. 557, 72 Pac. 243, it is held, that where the land of a Shawnee Indian (and there are special statutes protecting Indians from the defense of laches) was sold, while he was a minor, by a guardian appointed by a probate court, and the Indian, after coming of age, delayed for more than twenty-one years to question

the validity of the deed, and the property had in the meantime greatly increased in value, and passed into the hands of different owners, no fraud or concealment or other exceptional circumstances tending to excuse the delay being shown, he cannot afterwards be permitted to attack the deed on the ground that the proceedings upon which it was based were void for want of jurisdiction.

In *Choteau* v. *Klapmeyer*, 68 Kan. 829, 75 Pac. 1009, there is the same result where a void deed had been given for land of a half-breed Indian, and he did not begin his action for it until after the lapse of twenty-four years. He was held barred of his right by his own laches.

In *Howe* v. *South Park Commissioners*, 119 Ill. 101, 7 N. E. 333, it is said that the principle that lies at the foundation of all cases in that court on this subject is, "the party who challenges the title of his adversary to real property, must be diligent in discovering that which will avoid the title or render it invalid, and diligent in his application for relief. Unreasonable delay, not explained by equitable circumstances, has always been declared evidence of acquiescence and will bar relief."

[11-13] We do not mean that mere lapse of time or inaction on the part of the owner of real estate by clear record title, where there is no adverse possession, will defeat such title, but that unexplained and unreasonable delay, the existence of adverse claims of title and of facts and circumstances fairly brought home to the knowledge of the owner of the legal title, and the failure to act for the protection of such legal title for such a length of time as to destroy all of the evidence of the original transaction out of which such adverse claim arises, will and ought to bar such relief, for the sound reason so often stated, that he who fails to speak when he ought to, will not be heard if he attempts to speak after the rights and equities of others have supervened, when he ought to be silent.

The bill in this case recites the chain of conveyances running through half a century, shows that the appellant and its predecessors have claimed thereunder, but does not allege either ignorance of their rights or any other matter constituting any impediment whatever to an earlier prosecution of his suit. In *Hogg* v. *Shield*, 114 Va. 403, 76 S. E. 934, this is said: "A party who seeks the aid of a court of equity, after long delay in the assertion of a claim, should set forth in his bill specifically what were the impediments to an earlier prosecution of his claim, how he came to be so long ignorant of his rights, and the means, if any, used by the defendant to fraudulently keep him in ignorance, and how and when he first came to a knowledge of the matters alleged in his bill; otherwise, the chancellor may justly refuse to consider the case on his own showing without inquiring whether there is a demurrer or formal plea of the statute of limitations contained in the answer."

Here there were both the demurrer and the answer, setting up the defenses alluded to, so that the doctrine as stated in the case cited, and in many others which might be cited, applies.

[14] There is still another circumstance which is sufficient to defeat the relief prayed for in the bill. All of these appellees are either children or grandchildren of George W. Green, or claim under them. He received, according to his own executorial accounts, the entire proceeds arising from the sale of this land. If he has not accounted therefor, then his heirs at law and distributees, or those claiming under them, have thus received the proceeds of the sale by so much as George W. Green's estate was thereby augmented, if he did so fail to account. Upon equitable principles, it is evident that before these appellees can successfully assert title to this property they must account for the proceeds of its sale which their ancestor received.

This from Merwin's Equity and Equity Pleading, sec. 908, cited by this court in *Inge* v. *Inge*, 120 Va. 329, 91 S. E.

142, is appropriate: "From the nature of the case, no rigid rule can be laid down as to what delay will constitute laches; every suit must depend upon its own circumstances. But, whenever the delay fairly justifies the inference of acquiescence in the adverse claim, or whenever it has been of such a character as to induce other persons to alter their circumstances or conduct, so that the element of estoppel is introduced, a court of equity will commonly hold the delay to operate as an absolute bar."

In *Parker* v. *Stephenson,* 127 Va. 431, 104 S. E. 39, which was a suit for partition and the removal of a cloud, this is said: "The infant complainant in the present suit has come into a court of equity asking its aid and assistance to have the deed of trust, and the deed made to the appellee in pursuance of the sale made thereunder, 'declared void and of no effect as to said two-thirds of your orator,' and hence removed as a cloud on his title. Where the situation is such that equity can be done between the parties, the infancy of a complainant does not exclude him from the operation of the maxim that he who asks equity must do equity."

[15] The logic of these meager facts leads us irresistibly to these conclusions: While true, as a general rule, that the mere silence of the owner will not defeat a good record title to real estate, we have here the unequivocal declaration of the husband of one and the father of three of these claimants that his mother, Ann R. Green, received her share of the proceeds of sale, and this language is the antithesis of mere silence on his part. So also, if the statement be true, such action on Ann R. Green's part, under whom all of the appellees claim, is not mere silence, but express ratification which is conclusive against all who claim under her, and it may be added that the truth of Sidney M. Green's statement is also fairly inferable from her own conduct both during her husband's life and during the many years in which she survived him.

Upon the whole case, we are of opinion that the appellees are estopped by facts and circumstances which show that the evidence of the parties to the transaction, which might have established a complete defense, has been lost by lapse of time, that from the facts which do appear it may be fairly inferred that Ann R. Green, their common ancestor, under whom they claim, consented to the sale, and abandoned her title, and received her share of the purchase price; and in addition to this, because all of the claimants are either heirs at law of George W. Green, or claim as their successors in title, and so cannot repudiate his deed without accounting for the purchase price to the extent that his estate was increased thereby.

For the reasons indicated, we are of opinion that the trial court should have dismissed the bill, and, in accordance with the prayer of the cross-bill of the appellant, should have entered a decree confirming its title to the land in controversy, and we will enter such a decree here.

*Reversed.*